**TRANSPORT INSURANCE COMPANY, Lindsey & Newsom Claim Services and Janet E. Jones, Petitioners,**

v.

**Paula Trippel FAIRCLOTH, Respondent.**

No. D–4059.

Supreme Court of Texas.

Argued Sept. 22, 1994.

Decided March 30, 1995.

Rehearing Overruled June 15, 1995.

Arthur K. Smith, Dallas, for petitioners.

Steven Troy Roper, George Chandler, David Porter, Lufkin, L. Brent Farney, San Antonio, John E. Kinney, Woodville, William W. Kilgarlin, Santa Fe, NM, Jeffrey B. Bates, Lufkin, Harold Martin, Bellaire, Ann C. Lang, Houston, for respondent.

GONZALEZ, Justice, delivered the opinion of the Court, in which PHILLIPS, C.J., and HECHT, CORNYN, ENOCH and OWEN, JJ., join.

In this case, we decide whether there is any evidence of an actionable violation of the Texas Insurance Code, the Deceptive Trade Practices–Consumer Protection Act (DTPA), or common-law duties in connection with an insurer's negotiation of a settlement with a minor. Paula Trippel Faircloth sued Transport Insurance Company, Lindsey & Newsom Claim Services, and Janet Jones (collectively, Transport) for their alleged misconduct in procuring the settlement of her claim against Allied Van Lines. After a jury trial, the trial court rendered judgment for Faircloth based upon violations of Article 21.21 of the Insurance Code. The court of appeals affirmed. 861 S.W.2d 926. For the reasons stated herein, we reverse the judgment of the court of appeals and render judgment

that Faircloth take nothing from these petitioners.

On May 18, 1984, Marvin and Judith Kervin were killed when an Allied Van Lines tractor-trailer crossed the center line and struck their pickup truck. Facing almost certain liability and potentially large damages, Allied's insurer, Transport, desired to settle any potential claims arising from this accident as quickly and cheaply as possible.[1] Within hours of the accident, Jones, an adjustor for Lindsey & Newsom Claim Services acting on instructions from Transport, was investigating potential claims. Acting under the belief that 15–year–old Faircloth (then Paula Trippel) was the daughter of Judith Kervin and the step-daughter of Marvin Kervin, representatives of Transport sought to settle her claim against Allied.

Almost immediately after the accident, a family friend of the Kervins, Reverend Troy Caldwell, took steps to be appointed Faircloth's guardian.[2] He hired Mike Askins, an attorney, to open the guardianship. On May 22, 1984, Askins opened the guardianship for Faircloth, and Caldwell was named as her guardian. Within one month of the collision, they settled Faircloth's claim against Transport's insured for $250,000. The probate court approved the settlement and awarded one-third of the settlement to Askins for his fee, and two-thirds to Caldwell as Faircloth's guardian.

Upon reaching majority, Faircloth sued Transport, Lindsey & Newsom, Jones, and Caldwell alleging that they had, individually and in conspiracy with each other, defrauded her of the true value of her claim. Transport responded that Faircloth defrauded it by leading its representatives to believe that she was Judith Kervin's daughter, when in reality she was not her natural or adopted child, and as such, she had no right to collect for the woman's death. Transport concluded that since Faircloth had no standing to sue its insured the settlement was actually a windfall for her, and that Faircloth suffered no compensable injury as a result of Judith Kervin's death or of Transport's actions.

The trial court submitted the case to the jury on multiple theories, including breach of a "duty of good faith,"[3] breach of fiduciary duty, common-law fraud, civil conspiracy, and Insurance Code and DTPA violations.[4] Faircloth elected to recover under the Insurance Code and the DTPA. The trial court's judgment calculated the damages recoverable under all of her theories, but rendered judg-

---

1. Judith Kervin died instantly, and Marvin Kervin died within hours of the accident. Because Faircloth never alleged that Marvin Kervin was her father, Transport did not anticipate a wrongful death claim arising from his death. However, in the settlement agreement with Faircloth, Transport acquired a release on potential claims due to Marvin Kervin's death.

2. Caldwell's granddaughter was Faircloth's good friend and classmate. On occasion, Faircloth would spend the night at the Caldwells' home. On the day of the accident, she sought refuge with the Caldwell family. Caldwell presided at Judith Kervin's funeral two days after the accident. At some point, Caldwell suggested Faircloth live with him and his family, and that he be appointed her guardian.

3. The issue submitted on this theory, over Transport's objection, was as follows:
    Was the failure, if any, of any of the parties named below to act in good faith regarding the value of Paula Trippel Faircloth's claim a producing cause of damages to her?
    "Good faith" means honesty in fact in the conduct or transaction in question.
The instruction resembles the definition of good faith in the sale of goods under the UCC rather than any formulation of a common-law duty recognized by this Court in the insurance context. *Compare* Tex.Bus. & Com.Code § 1.201(19) (" 'Good faith' means honesty in fact in the conduct or transaction concerned.") *with Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987) ("A cause of action for breach of the duty of good faith and fair dealing is stated when ... there is no reasonable basis for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay.").

4. The jury found that Transport had failed to act in good faith; that Transport and Caldwell had breached their fiduciary duty to Faircloth; that Transport, Caldwell, and Jones were guilty of fraud; that Transport, Lindsey & Newsom, Caldwell, Jones, and Askins engaged in a civil conspiracy; that Transport, Lindsey & Newsom, Caldwell, and Jones engaged in false, misleading or deceptive acts or practices; that Transport, Lindsey & Newsom, and Jones engaged in an unconscionable action; and that Transport, Lindsey & Newsom, and Jones committed their violations knowingly.

ment based solely under the Insurance Code and DTPA.[5] The judgment included $602,625 to Faircloth for actual and "additional damages" and attorneys' fees, and also almost $75,000 in prejudgment interest.[6]

On appeal, the court of appeals reformed the calculation of prejudgment interest and affirmed the judgment. The court of appeals determined that the jury findings constituted a determination "pursuant to law" that the defendants had committed a deceptive act or practice which was actionable under the Insurance Code and the DTPA. It also held that there was evidence that the defendants had engaged in a civil conspiracy, committed fraud, and breached a duty to deal in good faith with Faircloth. We first consider the basis of the trial court's judgment, the alleged violations of the Insurance Code and the DTPA.

## I. Statutory Duty

■ Transport argues that there is no evidence of an actionable violation of the Insurance Code and the DTPA. Faircloth contends that she pleaded and proved a violation of Section 17.46(b)(23) of the DTPA, and that such a violation is actionable under the Insurance Code by any person suffering damage.[7] TEX. BUS. & COM.CODE § 17.46(b)(23); TEX.INS.CODE art. 21.21. We agree with Transport.

In *Allstate Ins. Co. v. Watson*, 876 S.W.2d 145 (Tex.1994), we determined the extent to which the Insurance Code gives standing to third parties having no contractual privity

with an insurer. The Insurance Code provides standing to "any person who has sustained actual damages" as a result of conduct prohibited by Section 17.46 of the DTPA. *See* TEX.INS.CODE art. 21.21, § 16. To be actionable under Section 17.46 of the DTPA, the insurer's wrongful conduct must appear as an unfair or deceptive act or practice in either Section 4 of Article 21.21 or in the rules and regulations of the State Board of Insurance adopted under Article 21.21. *See Watson*, 876 S.W.2d at 147.

Article 21.21 expressly makes actionable those acts or practices defined in Section 17.46 of the DTPA as unlawful deceptive practices. *Watson*, 876 S.W.2d at 149. Section 17.46(b)(23) makes unlawful "the failure to disclose information concerning *goods or services* which was known at the time of the transaction if such failure to disclose such information was intended to induce the *consumer* into a transaction into which the *consumer* would not have entered had the information been disclosed." TEX.BUS. & COM. CODE § 17.46(b)(23) (emphasis added). In this case, the trial court substituted the words "ordinary person" for "consumer" and omitted the terms "goods and services" in the jury charge. These substitutions were material, and Transport specifically objected to them.

■ An action pursuant to Section 17.46(b)(23) of the DTPA was not available to Faircloth because an insurer negotiating with a third party is neither inducing a "consumer" into a transaction nor withholding information concerning "goods and services."

5. Although the verdict contained jury findings against Caldwell and Askins, the court rendered judgment against only Transport, Lindsey & Newsom, and Jones for statutory violations. Askins was not a party to the suit. Caldwell did not appeal the findings of liability recited in the judgment.

6. The judgment included $160,700 in actual damages, $321,400 in "additional damages" (representing two times the amount of the actual damages), and $120,525 as reasonable and necessary attorneys' fees. The jury found $132,000 to be the difference between reasonable settlement value and the actual amount of the claims for the deaths of Judith and Marvin Kervin. The jury found additional damages for Faircloth's emotional distress and costs of psychiatric care incurred since the time of the settlement.

7. Faircloth's Insurance Code and DTPA theory was submitted to the jury in the following manner:

Regarding Paula Trippel Faircloth's claims did any of the parties named below engage in any false, misleading, or deceptive act or practice that was a producing cause of damages to Paula Trippel Faircloth?

"False, misleading, or deceptive act or practice" means failing to disclose information which was known at the time of the transaction if such information was intended to induce an ordinary person into a transaction into which that person would not have entered had the information been disclosed.

The DTPA defines a consumer as "an individual ... who seeks or acquires by purchase or lease, any goods or services." *Id.* § 17.45(4). The DTPA also defines the terms "goods and services." Section 17.45(1) defines "goods" as "tangible chattels or real property purchased or leased for use," and "services" as "work, labor, or service *purchased or leased for use.*" *Id.* § 17.45(1)–(2) (emphasis added). We are bound to construe these terms in accordance with their statutory definitions. TEX.GOV'T CODE § 311.011.

◼ Third parties negotiating a settlement with an insurer do not seek to purchase or lease any of the services of the insurer. They seek the proceeds of the policy. A party whose only relation to an insurance policy is to seek policy proceeds is not a "consumer." *English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983). Because there is no evidence that Faircloth is a consumer or that the information Transport allegedly withheld concerned goods or services as those terms are defined by the DTPA, we hold that there is no evidence of an actionable violation of the Insurance Code.

◼ Transport next argues that there is no evidence that Faircloth had standing to recover for any "unconscionable course of conduct."[8] We agree. Faircloth's lack of consumer status disposes of this issue. Unconscionability is made actionable solely by Section 17.50(a)(3) of the DTPA. TEX.BUS. & COM.CODE § 17.50(a)(3). DTPA violations under Section 17.50, as opposed to Section 17.46, are not grounds for liability under the Insurance Code. *Watson,* 876 S.W.2d at 149. In addition, actions under Section 17.50 are *only* available to consumers. *Compare to* TEX.INS.CODE art. 21.21, § 16 (providing standing to "any person" who suffers injury resulting from acts or practices prohibited by Section 17.46 of the Texas Civil Practices and Remedies Code). Because Faircloth was not a consumer, she lacked standing to pursue an unconscionability claim under Section 17.50(a)(3) of the DTPA.

The jury's finding that Transport acted "knowingly," for which the trial court assessed "additional damages," was conditioned on affirmative responses to the questions about Faircloth's Insurance Code and DTPA claims. Since she did not prove any actionable violation, the jury's answers to the questions concerning additional damages must be disregarded. In addition, the jury's award of attorneys' fees must be disregarded because the Insurance Code and DTPA grounds of recovery supporting the award fail. Therefore, we reverse the trial court's judgment erroneously premised on the Insurance Code and the DTPA.

◼ However, our inquiry does not stop there. Faircloth also received favorable responses from the jury on several common-law theories: fraud, civil conspiracy, breach of a fiduciary duty, and breach of the common-law duty of good faith and fair dealing. When a jury returns favorable findings on alternative theories, the prevailing party may seek recovery under an alternative theory if the judgment based on one theory is reversed on appeal. *Boyce Iron Works v. Southwestern Bell Tel. Co.,* 747 S.W.2d 785, 787 (Tex.1988). Therefore, we must consider whether the evidence is legally insufficient to support liability under any theory submitted to the jury. We review the record to determine if there is evidence to sustain the jury findings on any common-law theory.

## II. Common–Law Theories

### A. Injury

◼ Transport first argues that it cannot be liable under any theory because it conclusively established that Faircloth suffered no injury as a result of the settlement. Trans-

---

8. Regarding Faircloth's unconscionability theory, the jury was asked:

Did any of the parties named below engage in any unconscionable action or course of action that was a producing cause of damages, if any, to Paula Trippel Faircloth?

An "unconscionable action or course of action" is an act or practice that, to a person's detriment, either:

a. takes advantage of the lack of knowledge, ability, experience, age or capacity of a person to a grossly unfair degree; or

b. results in gross disparity between value received and consideration paid in a transaction involving transfer of consideration; stated differently, did Paula Trippel Faircloth receive significantly less than the Defendants knew or believed she was entitled to.

port contends that it proved as a matter of law that Faircloth is not the biological or adopted child of Judith Kervin. Under the wrongful death statute, Faircloth would not have a claim arising from Judith Kervin's wrongful death because only biological or legally-adopted children of the decedent have standing. *See Goss v. Franz*, 287 S.W.2d 289, 290 (Tex.Civ.App.—Amarillo 1956, writ ref'd). Transport concludes that not only did she suffer no injury, but Faircloth settled a claim to which she had no right, thereby receiving a windfall. While this issue was *properly one for the jury*, we cannot set aside the jury's verdict for the reason urged by Transport, lack of legally sufficient evidence.

Transport learned for the first time during discovery that Faircloth was not the biological child of Judith Kervin, and that there was no record of any adoption proceeding. It attempted to prove Faircloth had no standing under the wrongful death statute, but the trial court granted a motion in limine excluding all evidence that Faircloth was not Judith Kervin's biological or adopted child. The court excluded the evidence because of the so-called "picture frame" theory, according to which only the facts known to Transport at the time of the settlement were relevant. Consequently, Transport developed by bill of exception an extensive record to show that Faircloth did not have standing to make a claim against Allied Van Lines, Transport's insured. The bill of exceptions included a birth certificate which reflects that Faircloth was born to a woman other than Judith Kervin. Faircloth admitted on the record outside the presence of the jury that she had known since she was very young that she was not Judith Kervin's biological child. She testified that she had always believed that she was adopted. Askins and Caldwell were also examined outside the jury's presence. Both testified that they were concerned that

if Transport learned Faircloth could not establish her relation to Judith Kervin, Transport might withdraw its settlement offer.[9]

The excluded evidence was unquestionably relevant to the issue of injury. Transport assigned no error to the exclusion of the evidence, however. Its only complaint is that the evidence in the bill of exceptions conclusively established Faircloth's lack of injury. For two reasons, we cannot adopt Transport's argument as grounds for vacating the jury's findings on the common-law claims.

■ First, an appellate court generally may not reverse and render a different judgment based on excluded evidence. *J.M. Abott Oil Co. v. San Antonio Brewing Ass'n*, 104 Tex. 574, 141 S.W. 517, 517 (1911); *see Martin v. Allman*, 668 S.W.2d 795, 799 (Tex. App.—Dallas 1984, no writ) (holding that a party is entitled to rely on a favorable ruling and need not rebut evidence tendered by an opposing party in a bill of exceptions). Evidence is not conclusive unless it was admitted into evidence, and the opposing party failed to rebut it. *Abott*, 141 S.W. at 517. If this Court sets aside a verdict based on evidence the jury did not hear, we may not render a contrary judgment. Instead, we must remand for trial in order to give the opposing party an opportunity to impeach the evidence or to respond with rebuttal evidence.[10]

■ Second, even if Transport's evidence about Faircloth had been properly admitted, the standard of review for Transport's legal sufficiency complaint precludes us from considering the evidence. Because Faircloth had the burden to prove injury, the standard of review is whether there was no evidence to support the jury's findings. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). In considering a "no evidence" point, we may consider only the evidence

9. Askins initially considered trying to establish common-law adoption or adoption by estoppel to support Faircloth's right to recover. He discovered case law that cast doubt on the viability of wrongful death claims by children who were not legally adopted. *E.g., Moran v. Adler*, 570 S.W.2d 883, 888 (Tex.1978); *Heien v. Crabtree*, 369 S.W.2d 28, 30–31 (Tex.1963); *Goss v. Franz*, 287 S.W.2d 289, 290 (Tex.Civ.App.—Amarillo 1956, writ ref'd).

10. We recognize the possibility that a party could make a binding admission in a bill of review which could not be rebutted. *See Gevinson v. Manhattan Constr. Co.*, 449 S.W.2d 458, 466 (Tex.1969). We reserve judgment on whether rendition would be proper in this circumstance. However, if the erroneously excluded evidence conceivably could be rebutted, remand is the proper remedy.

supporting the finding and disregard evidence and inferences to the contrary. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex. 1992). Considering only the evidence which *supports* the verdict in this case, and disregarding the excluded evidence, we must overrule this legal sufficiency point of error. We turn to consider whether Faircloth established that Transport had a duty and breached it under any theory on which the jury made findings.

**B. Fraud**

Transport argues that there was no evidence of fraud or of Faircloth's reliance on fraudulent representations. Transport hired Lindsey & Newsom to investigate the accident and to manage potential liability claims. Lindsey & Newsom assigned Jones to handle the case. During the investigation, Jones concluded that Faircloth and two adult sons were Judith Kervin's children. Jones began the settlement process, as authorized by Transport. During the process, Transport obtained opinions concerning the possible amount of a hypothetical jury award for Judith Kervin's wrongful death.

Faircloth's fraud claim primarily arose from the events at a meeting on May 21, 1984, three days after the accident which killed the Kervins. Faircloth recalls that Caldwell, Askins, Jones, Dell Jackson (who was Judith Kervin's 37–year–old son), and others were at the Caldwell home discussing the need to employ Askins to open a guardianship.[11] They also discussed Transport's offer of $250,000 to settle the wrongful death claim and told Faircloth it was a good deal. Jackson testified:

Q Okay. And what did they tell Paula about the $250,000?

A They said that was the great deal, that was—that was really top—or top dollar, said that was real good for a minor, she was a minor, if she hadn't been a minor, that she wouldn't come out with anything. . . .

■ An actionable representation is one concerning a material fact; a pure expression of opinion will not support an action for fraud. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983). In particular, an expression of opinion about monetary value is not a representation of fact which gives rise to an action for fraud. *See McCollum v. P/S Invs., Ltd.*, 764 S.W.2d 252, 254 (Tex.App.—Dallas 1988, writ denied); *Cravens v. Skinner*, 626 S.W.2d 173, 177 (Tex.App.—Fort Worth 1981, no writ); *Morris v. Leonard*, 441 S.W.2d 877, 881 (Tex.App.—Fort Worth 1969, writ ref'd n.r.e.), *cert. denied*, 402 U.S. 974, 91 S.Ct. 1667, 29 L.Ed.2d 139 (1971). Whether a statement is an actionable statement of "fact" or merely one of "opinion" often depends on the circumstances in which a statement is made. Among the relevant circumstances are the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future. *See Trenholm*, 646 S.W.2d at 930; *Safety Cas. Co. v. McGee*, 133 Tex. 233, 127 S.W.2d 176, 178 (1939); *Angelo Broadcasting, Inc. v. Satellite Music Network, Inc.*, 836 S.W.2d 726, 733 (Tex.App.—Dallas 1992, writ denied), *disapproved on other grounds by Hines v. Hash*, 843 S.W.2d 464, 469–70 (Tex.1992). A statement of value may be actionable if the speaker knows it is false. *Texas Indus. Trust v. Lusk*, 312 S.W.2d 324, 326 (Tex.Civ.App.—San Antonio 1958, writ ref'd). Faircloth contends that Transport's representative, Jones, gave a false statement of fact about the value of her claim, since Transport had obtained estimates at a higher amount than it offered in settlement.

■ The most specific statement any witness to the May 21st meeting recalled was that the settlement offer was "top dollar." No evidence pinpoints the identity of the speaker who may have made that statement. Assuming the speaker was one of Transport's agents, there is no evidence that the statement was a false statement of fact, or that the agent knew it was false when made. When Transport investigated the claim aris-

---

11. Testimony from another witness establishes that Mark Maneval, an agent for Transport, accompanied Jones to the meeting.

ing from Judith Kervin's death, it sought expert opinions about its potential value. The record contains a note by Transport's claims branch manager, Mike Roggen, dated almost three weeks after the May 21st meeting, reflecting the estimates made by two attorneys assigned to value Faircloth's claim. One expert from Beaumont estimated the case was worth "up to" $500,000 or more, while another expert from Houston estimated its value at $350,000 to $400,000. Roggen's note also stated that $250,000 was the most realistic estimate of Transport's exposure, based on the opinions of these attorneys, the opinion of the claimant's attorney, and "our own thinking." The mere fact that Transport was aware of opinions giving a higher value to Faircloth's claim than it offered to settle with her is no evidence that an opinion by any Transport agent about $250,000 being "top dollar" was false. Transport could disagree with its consultants about the value of the claim without being guilty of fraud.

Unlike the value of tangible property, such as automobiles or real estate, the value of a wrongful death claim is not susceptible to precise calculation. The value of such an unliquidated claim is inherently a matter of opinion. Whether the amount of a settlement offer approximates what a jury would award at trial depends on unpredictable factors such as favorable rulings from the trial court on venue and other legal issues, the jury, the availability and credibility of witnesses, the ability of the attorneys, and so forth. Experts can sincerely disagree about the value of a claim. For example, in the trial of this case, Faircloth's experts testified that the wrongful death claim was worth at least one million dollars, but the jury proved them wrong by returning a verdict valuing Faircloth's claim at about $160,000. Her experts were mistaken in their opinion of the value of the claim, not knowingly deceptive or guilty of false statements. Likewise, the views expressed about the adequacy of Transport's $250,000 settlement offer were opinions only, and there is no evidence Transport knew that they were false.

An opinion also may be treated as an actionable statement of fact when the opinion is based on or buttressed with false facts. *Trenholm*, 646 S.W.2d at 930–31. In *Trenholm*, a developer induced homebuilders to purchase property next to a trailer park that had a depressing effect on the value of the neighborhood. The developer falsely stated that the trailer park had been sold and that the tenants had been given notice their leases would not be renewed. The developer opined that the trailer park would be gone in a matter of months. The court held that the misstatements of fact were so intertwined with the developer's statement of opinion that the entire statement amounted to a false representation of fact. *Id.* at 931. In the present case, there are no comparable representations. There is no evidence that Transport buttressed its opinion about the value of Faircloth's settlement offer with false facts. There is no allegation that, for example, Transport falsely stated that it had settled similar claims for comparable amounts or that it misrepresented facts concerning the Kervins' accident.

Superior knowledge by one party may also provide the occasion for fraud. A court may consider a false opinion of value as an actionable statement of fact if it is made by one who should know another party is justifiably relying on the speaker's superior knowledge. *See Safety Cas. Co. v. McGee*, 133 Tex. 233, 127 S.W.2d 176, 178 (1939). Missing in this case is evidence that Transport knew Faircloth was relying on its supposedly superior knowledge. Faircloth may have been unsophisticated in financial matters, but any settlement had to be accepted on her behalf by Caldwell, her guardian, on the advice of Askins, Faircloth's attorney, and upon approval by the probate court. Thus, in this case Faircloth was not justifiably relying on Transport's superior knowledge. The theory of superior knowledge will not support the jury's finding of fraud.

We conclude that there is no evidence supporting the jury's finding of fraud. Before leaving the issue, however, we address some arguments made in Justice Hightower's concurring and dissenting opinion.

The concurring and dissenting opinion's reliance on *McGee*, to conclude that representations of value are actionable, is not war-

ranted. *McGee* is clearly distinguishable from this case. In *McGee,* an insurer offered to settle an injured worker's compensation claim for an amount the insurer had calculated on the basis of partial disability. The insurer represented that the settlement offer was the best the worker could receive. However, the insurer knew that the employee was totally disabled, and "knew the law relating to total disability and partial disability and the method of determining and computing the amount of compensation to be paid." *Id.* at 179. Thus, the insurer's statement was shown to be a knowing misrepresentation of the actual value of the claim, which was a precisely ascertainable amount. By contrast, the opinion that Transport's $250,-000 offer was "top dollar" related to an unliquidated claim, the value of which was not subject to exact calculation.

The concurring and dissenting opinion also contends that Transport discouraged Faircloth from seeking competent counsel to preserve her ignorance about the "true" value of her claim. Contrary to this assertion, there is no evidence that Transport ever said that it was unnecessary or inadvisable for Faircloth to consult a lawyer, that it had a desire to settle before Faircloth obtained legal counsel, or that it discouraged a "friendly suit." The argument is that Transport encouraged Faircloth to retain Askins to represent her even though Transport considered him an incompetent attorney, thereby exacerbating Faircloth's vulnerability to deception. However, the evidence does not support these inferences. Although Transport's claims branch manager, Roggen, testified that he did not consider Askins a "top gun," his testimony indicated no more than a belief that Askins was not the Tom Cruise of Texas trial attorneys. This is not evidence that Roggen or anyone else at Transport considered Askins incompetent. Moreover, Roggen also stated that he thought Askins was a capable lawyer whose foremost objective was to serve Faircloth's best interests.

The concurring and dissenting opinion's position, taken to its logical conclusion, would lead to absurd results. The necessary implication from its reasoning is that a party must refuse to settle with unsophisticated claim-ants if their lawyer is not a "top gun" to avoid later claims of fraud. We will not embrace a holding that disqualifies the vast majority of well-qualified lawyers from handling settlements.

## C. Civil Conspiracy

■ Faircloth's final argument is that Transport took advantage of her naivete by conspiring with Caldwell, a guardian it thought disloyal to his charge, and Askins, an attorney it thought corrupt. Faircloth's conspiracy theory is that Transport colluded with Caldwell and Askins to get her to settle for less than her claim was worth. Civil conspiracy requires a meeting of the minds between two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex. 1983). When viewing meager circumstantial evidence, if "circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred." *$56,700 in U.S. Currency v. State,* 730 S.W.2d 659, 662 (Tex.1987). Circumstantial evidence may be used to establish any material fact, but it must constitute more than mere suspicion. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). As we said in *Browning–Ferris,* "some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." *Id.* at 927.

■ It was incumbent on Faircloth to establish the elements of civil conspiracy. Having applied the principles of *$56,700* and *Browning–Ferris* to the record in this case, we conclude that she did not as a matter of law. The evidence shows:

1) Jones met Caldwell and Faircloth the day of the accident or the next day. Jones recommended attorneys to Caldwell to represent Faircloth, *but Askins was not among those she recommended.*

2) Caldwell initially contacted Askins as a referral from one of his acquaintances. Caldwell hired Askins because he was willing to petition the probate court for a temporary guardianship which could be accomplished within a few days.

3) Once Caldwell was appointed guardian, he drew on the amounts invested for Faircloth at a rate of $750 per month for her support.

4) Askins acknowledged that he had never handled a wrongful death claim such as Faircloth's claim, that he did not independently investigate the accident, and that he needed money.

5) On one occasion, Caldwell telephoned Jones to ask her to explain the difference between a structured settlement and payment in a lump sum.

6) The only other evidence of contact between Jones and Caldwell or Askins was the May 21st meeting at Caldwell's home. Roggen then took over negotiations for the settlement, which the probate court approved within three weeks of the accident.

The deficiency in Faircloth's conspiracy argument is the lack of evidence to connect Transport with Caldwell's or Askins' conduct in any legally cognizable way. On these facts alone, no inference can arise that Transport was a conspirator with Caldwell or Askins. No evidence shows that Transport was aware of Askins' financial situation, or that Caldwell may have planned to profit improperly from Faircloth's guardianship by charging her for her support. There is no evidence that Transport committed, or was aware of, any unlawful act. In short, no evidence or any inference from it makes a conspiracy conclusion more probable than not. We conclude that there is no evidence of civil conspiracy that would justify attributing to Transport the misconduct, if any, of Caldwell or Askins.

## D. Duty from Special Relationship

Faircloth contends that Transport owed her a duty comparable to the common-law duty an insurance company owes its insured. *See Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165 (Tex.1987). Alternatively, she asserts that Jones established a confidential relationship with Faircloth "by her attitude and representations." Faircloth obtained findings that Transport did not act in good faith and that the defendants breached a fiduciary duty owed her. Both theories depend on whether a special relationship arose between Transport and Faircloth.

This Court has held that an insurer owes an insured a duty of good faith and fair dealing because of the special relationship arising out of the insurance contract. *Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 212 (Tex.1988). However, the Court has not squarely ruled on whether an insurer's duty of good faith and fair dealing extends to a third-party claimant. *See Allstate Ins. Co. v. Watson*, 876 S.W.2d 145, 150 (Tex.1994) (holding that an insurer owes no duty of good faith to third-party claimants under the Insurance Code, without reaching the question of a possible common-law duty). Identifying a source of such a duty is problematic. As this Court stated in *Watson:*

> A third party claimant has no contract with the insurer or the insured, has not paid any premiums, has no legal relationship with the insurer, and in short, has no basis upon which to expect or demand the benefit of . . . extra-contractual obligations imposed on insurers.

*Id.* at 149.

An insured's interests are adverse to third-party claimants. *Id.* In this case, Faircloth's interests were adverse to Allied Van Lines, and Transport's duty of good faith and fair dealing ran to Allied, its insured. Transport owed a duty to its insured to defend the claim, and if warranted by the facts, to settle the claim consistent with the insured's best interests. *American Physicians Ins. Exchange v. Garcia*, 876 S.W.2d 842, 846–47 (Tex.1994) (noting the insurer's duty to settle); *American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482 (Tex.1992) (identifying an insurer's duties to investigate claims, defend at trial, and negotiate settlement); *Ranger County Mut. Ins. Co. v. Guin*, 723 S.W.2d 656, 658 (Tex.1987) (stating the insurer's duty to put the insured's interests on par with its own). For policy reasons, we do not require insurance companies to perform duties for third-party claimants that are "coextensive and conflicting" with the duties they owe their insureds. *Watson*, 876 S.W.2d at 150. Owing such duties to third parties would "necessarily compromise the duties the insurer owes to its insured."

*Id.* In the case before us, no compelling facts suggest a special relationship existed to warrant imposing on Transport a duty of good faith and fair dealing owed to the third-party claimant, Faircloth.

There was likewise no special relationship between Transport and Faircloth to justify imposing a fiduciary duty on Transport. A fiduciary or confidential relationship may arise from circumstances of the particular case, but it must exist prior to, and apart from, the agreement made the basis of the suit. *Consolidated Gas & Equip. Co. v. Thompson,* 405 S.W.2d 333, 336–37 (Tex. 1966). Faircloth had no dealings with Transport except as a claimant against Transport's insured. Faircloth, Caldwell, or Askins had no reason to place a high degree of trust in Transport. Therefore, no special relationship arose before or during the settlement negotiations which could give rise to fiduciary duties. There was no relationship at all except for the settlement agreement made the basis of the present suit.

### III. Conclusion

Public policy favors the amicable settlement of controversies. *Elbaor v. Smith,* 845 S.W.2d 240, 250 (Tex.1992). Settlements are favored because they avoid the uncertainties regarding the outcome of litigation, and the often exorbitant amounts of time and money to prosecute or defend claims at trial. It would jeopardize settlement agreements involving minors if, upon reaching majority, a minor may disregard an agreement and claim that an insurer negotiated too good a deal for itself or that the minor was not adequately represented. There would be little incentive to settle if agreements are easily set aside, and the claims have to be tried years later, and even less, if large judgments may be awarded years later on a "second guess" in another trial. The law requires more than recollections of overstated opinions of value to set aside parties' agreements. Because under this record the evidence does not support judgment for Faircloth under any theory of liability, we reverse the judgment of the court of appeals and render judgment that she take nothing from these petitioners. We remand the cause to the trial court to give Faircloth opportunity to elect under the verdict against the remaining defendant.

ENOCH, Justice, concurring.

While I agree with all parts of the Court's opinion, I write separately to express an additional reason for reversal. Because Faircloth is a third party claimant, she has no statutory cause of action based on unfair claim settlement practices. *Allstate Ins. Co. v. Watson,* 876 S.W.2d 145, 149 (Tex.1994). Therefore, Faircloth must establish a common law fraud in order to recover.

The elements of a common law fraud claim are (1) a material representation, (2) that was false, (3) that the speaker knew was false at the time it was made, (4) that was made with the intention of being acted upon, (5) that the party acted in reliance, and (6) that injury was suffered. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983). That Transport's agents may have placed a potential value on Faircloth's claim above $250,000 and that maybe Transport told Faircloth that the $250,000 was a "great deal, that was—that was really top—or top dollar;" is no evidence of a material representation. Transport, an adverse party in the course of negotiation, had no duty to disclose the maximum amount it would pay to settle this claim any more than Faircloth was required to disclose the lowest amount she was willing to accept. *See Mileski v. Dorey,* 559 A.2d 339, 340 (Me. 1989) (holding that purchaser who paid more to buy than what seller would have actually sold for has no claim for fraud). Regardless, the dissent concedes that general statements regarding the value of a claim without more are nonactionable puffery. 898 S.W.2d 285; *see Pennington v. Singleton,* 606 S.W.2d 682, 687 (Tex.1980). Faircloth's claim fails because she introduced no evidence of a material representation. I agree with the Court's opinion and for this additional reason concur in the judgment of the Court.

HIGHTOWER, Justice, joined by GAMMAGE, J., concurring in part and dissenting in part.

I join Part I of the Court's opinion; however, I dissent from Part II.B. because I

believe that there was enough evidence of fraud to submit this case to a jury.[1]

The judiciary of this state has been intentionally structured to hinder the rendition of judgments in derogation of a jury's verdict. The intermediate courts of appeal are entitled to determine whether the jury's verdict is against the great weight and preponderance of the evidence, but they are not entitled to make a positive finding and render judgment. Under our system, juries find facts. Courts of appeal may only *unfind* facts and remand to a new jury. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361, 368 (1960); St. John Garwood, *The Question of Insufficient Evidence on Appeal*, 30 Tex.L.Rev. 803, 813–14 (1952)). This Court's role is still more limited. We are prohibited from determining whether a finding is against the great weight and preponderance of the evidence because the decision of the court of appeals on questions of fact is conclusive. Tex. Const. Ann. art. 5, § 6 (Vernon 1993). In this case, we are called upon only to determine whether there was such a total absence of evidence that resort to a jury was unnecessary.

In deciding this legal question, our scope of review is severely limited. We may not act as *de facto* jurors, judicially erasing evidence which we might have discounted had we served as trier of fact. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). The evidence within our scope of review is only the evidence and inferences tending to support the jury's finding, viewing the evidence most favorably in support of the finding and disregarding all contrary evidence and inferences. *Browning–Ferris*, 865 S.W.2d at 928; *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992). This scope of review is well settled and the recitation of this standard has not varied. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535 (Tex.1981); *Transport Ins. Co. v. Mabra*, 487 S.W.2d 704 (Tex.1972); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Tudor v. Tudor*, 158 Tex. 559, 314 S.W.2d 793 (1958). Though the Court recites these rules, an inspection of its opinion reveals that they have not been applied.

The Court's opinion proceeds, almost in its entirety, upon the theory that it was Paula, not Transport, who rushed the initial settlement negotiations. The Court's version of events includes or assumes the following:

* Askins recognized the difficulty of establishing that Paula was Judith Kervin's heir.

* Askins and Caldwell were concerned that Transport would withdraw its settlement offer if they discovered Paula could not establish heirship.

* Transport's claims manager thought $250,000.00 was the most realistic estimate of its exposure.

* Testimony concerning Askins' ability merely indicated a belief that Askins was not among the very best lawyers in the state.

To the extent that there is direct evidence for any of these propositions in the record,[2] this evidence impeaches rather than supports the jury's verdict and is outside our scope of review. To the extent that the Court is drawing inferences from other evidence in the record, their inferences are prohibited by

---

1. In this dissent I choose to focus on the manner in which the Court improperly applies "no evidence" review to the elements of fraud. I choose not to discuss (except to point out) the Court's *dicta* that evidence of Paula's parentage was "unquestionably relevant" while conceding that the admissibility of the evidence was neither in play nor determinative of the outcome of this appeal. In addition, I would point out that while many of the "laundry list" provisions in section 17.46(b) concern "goods," "services," and "consumers," some do not. *See, e.g.,* Tex.Bus. & Com.Code Ann. § 17.46(b)(12) (Vernon Supp.1995) ("representing that an *agreement* confers or involves

rights, remedies, or obligations which it does not have or involve, or which are prohibited by law"). The only "laundry list" violation submitted to and found by the jury *in this case* provides no remedy for one in Paula's position. The Court does not pass upon the question of whether one in Paula's position could proceed under section 17.46(b)(12).

2. Much of this evidence is contained in Transport's bills of review and was not even heard by the finder of fact.

our scope of review. We are simply not permitted to consider this evidence.

Our no evidence *standard* of review is just as severe as our no evidence scope of review. A no evidence point will be sustained only if reasonable minds could not differ that the evidence supporting the jury's finding lacks probative force. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Id.; Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059, 1062 (1898). However, there is *some evidence,* more than a scintilla, if the evidence furnishes some reasonable basis for **differing conclusions** by reasonable minds as to the existence of the vital fact. *Kindred,* 650 S.W.2d at 63. *See also* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex.L.Rev. 359, 363 (1960).

The vital fact in question here is whether there was an actionable misrepresentation of material fact. Although I might not have found fraud had I been a juror in this case, that is not the question before the Court. The question is whether, under the evidence, reasonable persons could reach differing conclusions about whether or not fraud occurred.

Thus, the legal definition of fraud is in play. While I would agree that representations made during a settlement negotiation concerning the value of an unliquidated claim, *without more,* would generally constitute mere puffery, that is not the case we have before us.

An expression of opinion may constitute fraud when the speaker purports to have special knowledge. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983). Further, when one relies upon the supposed superior knowledge and experience of another and on his statement that it is unnecessary or inadvisable for him to consult a lawyer, what would otherwise be a mistaken expression of legal opinion can become fraudulent statement of fact. *Safety Cas. Co. v. McGee,* 133 Tex. 233, 127 S.W.2d 176 (1939). Simply stated, opinion is actionable if a defendant makes use of artifice or trickery to prevent further investigation, and so deprives the plaintiff of other sources of information. *See* William L. Prosser, Handbook of The Law of Torts § 109, p. 727 (4th ed. 1971).

There is testimony that Transport's agents represented the maximum value of Paula's claim to be less than it was *and further* represented that she would get nothing at all if she delayed settlement or submitted her claim to a jury.[3] There is evidence that at or

---

**3.** The participants in the May 21 settlement meeting were Jones (of Lindsey and Newsome), Maneval (of Transport), Caldwell and Askins.

Q: Who all was talking Paula?
A: Like I say, Mr. Caldwell, Mike Askins, Janet Jones from the insurance company. Like I said, I believe that there was somebody else with Janet Jones. They were like a pair. I vaguely remember somebody—in fact, what I remember is like somebody said, there in a dark suit.

Jones, the adjustor, identified this "dark suit" as Maneval.

Q: On Monday following this collision—I think that's the 21st, is that our memory?
A: Yes, sir.
Q: And you've looked back on your notes?
A: Yes, I have.
Q: And your notes show that you went into the home of Rev. Caldwell on the 21st?
A: That's correct.
Q: With Mark Maneval?
A: Correct.

Paula's testimony and the reasonable inferences from it support the proposition that all of the participants in the meeting tried to pressure her to take the offer of settlement quickly because the offer was the maximum amount she could get for her claim, and she would get nothing at all if she delayed or submitted it to a jury. Paula testified:

Q: Were all these people talking? Not at the same time, but were all of them participating in the conversation; or was there just one that was the spokesperson?
A: They were all participating in the conversation.
Q: From their participation in the conversation, from the information they communicated to you and what they said, what impressions did you draw or form from what they were telling you?

\* \* \* \* \* \*

A: They were giving me impressions that I could possibly get a settlement out of this, but I had to settle quickly. I had to use Mike Askins as my attorney; and that if I didn't go ahead and settle quickly, that it would possi-

near the time of the representations, Transport's own attorneys evaluated the claim at twice the value represented to be the maximum by Transport's agents.[4] The claims file specifically reveals a recognition that Allied's driver may have been grossly negligent,[5] and manifests an intent to rush the settlement and maintain control of the negotiations.[6] There is evidence that Transport's agents

> bly go to court. And if it would go to court, I wouldn't get anything.
>
> \*     \*     \*     \*     \*     \*
>
> Q: Were you led to believe that you had any choice about it?
> A: No, sir, I wasn't.

4. Quoting from Plaintiff's Exhibit 3, an enlarged memorandum to the claims file:

> Beaumont counsel initially evaluated the case at up to $500K possibly higher while Houston Counsel felt comfortable at $350–400K; Houston venue much more conservative than Beaumont.

5. Quoting from Plaintiff's exhibit 2, also an enlarged memorandum to the claims file:

> We're concerned our driver may have pulled out to pass his preceding co. employee, realized there wasn't adequate distance braked and then jackknifed. This, if a plaintiff (abbreviated) could prove, constitutes possibly gross negligence and opens the door for punitive. Claimant (abbreviated) attorney (abbreviated) hasn't mentioned this so far.

6. Also quoting from plaintiff's exhibit 3:

> Paula's demand is tenuous since it is predicated on settling and Court approval before one of her brothers contests guardianship which is now being threatened. They see a chance to capitalize and turn an astronomical settlement for themselves.
>
> \*     \*     \*     \*     \*     \*
>
> Please call time of essence. I would settle now for 250,000. Preacher has temporary guardianship.

> Concerning the meeting on the 21st, Janet Jones testified:
> Q: During your visit in the home of Rev. Caldwell on the 21st, am I correct that Dell Jackson came into the home?
> A: Yes, he did.
> Q: Am I correct that your notes reflect that during that visit, you discussed legal handling?
> A: Yes, I did.
> Q: Am I correct that your notes regarding that meeting said "Maintain control"?
> A: Yes, it did.

In addition, Jones read a portion of her notes into the record which said: "Get it done as fast as possible. Settlement figures on the low side."

7. Paula's step-brother testified:

encouraged Paula to stick with Mr. Askins and promoted his supposed abilities.[7] There is further evidence that while Transport engaged in this effort to encourage employment of Askins, they did not consider him to be an outstanding attorney[8] and recognized that the settlement value of Paula's claim would rise and fall with Askins' level of competence.[9] Further, there is evidence that while

> Q: Did you hear any conversations, Dell, between the people that you've identified that were talking to Paula about the settlement of her claim resulting from the tragedy that caused you to be there in the first instance as to who she should hire as a lawyer and why?
> A: Yes, sir. They asked all of us, really go with Mike Askins because he was already familiarized with the case, he knew what was going on, and that he at some time or another had been an adjustor for Allied.
>
> \*     \*     \*     \*     \*     \*
>
> Q: From what you heard, did you get the impression that you had—that Paula and you would be better off and have a better chance of a good settlement if you hired Mr. Askins?
> A: Yes, sir.
> Q: And at the table, as far as the people that were doing the talking, was Janet Jones participating in these conversations?
> A: Yes, Sir.
> Q: Did Janet Jones acknowledge and give verification and her blessing to what you just said, that you overheard?
> A: Yes, sir.
>
> \*     \*     \*     \*     \*     \*
>
> Q: Do you feel that Paula got the impression that these folks were concerned and were trying to do what was in her best interests?
> A: Yes, sir.
> Q: Do you feel that they were trying to make her believe that?
> A: Yes, sir, I do.

8. Mike Roggen, One of Transport's managers, testified:

> Q: ... What I'm getting at, you did not view Mr. Askins, whether you were putting that factor in the computer, your mental computer of evaluation—you did not evaluate Mr. Askins as being the experienced top gun type trial lawyer that you would have somebody else that had a reputation?
> A: That's true.

9. Mike Roggen further testified:

> Q: You're giving me a little laundry list of things that you put into the formula arriving at a fair evaluation of what a claim ought to be settled for.... You would size up the beneficiary or the plaintiff, in this case a 15–year–old little girl who was well liked and well respected, who had nobody but the de-

Transport encouraged Paula to use Askins and settle immediately, it recognized that Askins had not discovered the punitive damages potential of Paula's claim.[10] While I do not attempt any definitive declaration concerning the actual abilities of Paula's attorney, there is enough evidence to infer (in favor of the verdict) that Transport would not have retained Askins to represent it at the time that it was recommending that Paula follow exactly that course. While I do not believe that an insurer bears a general burden to see that its adversaries are adequately represented, it certainly has no privilege to make representations aimed at preventing it.

In *Safety Cas. Co. v. McGee*, 133 Tex. 233, 127 S.W.2d 176 (1939), this Court found actionable fraud based upon representations (much like Paula received) that the settlement was the maximum amount of compensation to which the plaintiff was entitled. In attempting to distinguish *McGee*, the Court advances a distinction without a difference. The Court argues that *McGee* is a workers' compensation claim, meaning the value of Mr. McGee's right to sue was ascertainable by a concrete, statutory standard and the representations were therefore different from those involved in this case. 898 S.W.2d at 277–78. Whether or not this is true, this is not the basis upon which the *McGee* court acted and the Court misapprehends the holding in that case.

*McGee* recognized the general rule that representations concerning matters of law are not actionable because everyone is presumed to know the law. *McGee*, 127 S.W.2d at 177. However, the court, quoting authority from as early as 1857, noted that "so harsh a rule, founded upon a presumption so arbitrary, ought to be modified in its application *by every exception which can be admitted without defeating its policy." Id.* (emphasis added). The Court resorted to the *exception* from the general rule for situations "where one who himself knows the law deceives another by misrepresenting the law to him, *or* knowing him to be ignorant of it, takes advantage of him through such ignorance, *or* where the person to whom the representations are made relies upon the supposed superior knowledge and experience of the other party and on his statement that it is unnecessary or inadvisable for him to consult a lawyer." *Id.* 127 S.W.2d at 178. In judging the comparative levels of knowledge of the parties, *McGee* recognized that "in each case of fraud dependence must be had upon the special circumstances surrounding it, and no definite rule can be laid down as to what degree of ignorance or condition of mind will vitiate it." *Id.* 127 S.W.2d at 180. *McGee* granted relief based upon the disparity of knowledge between an experienced adjustor and a high school and college educated plaintiff. It did so based on representations which this educated party might have veri-

ceased to care for her. Then you would look at another factor as to the quality or competency of the lawyer representing Paula Trippel. That was one of the things you said you'd look at. Now, why would that go into the factor?

A: Simply because various attorneys, Jefferson City, Houston, Michigan, all over the country, have reputations of being outstandingly aggressive, successful, and are in the media often. And they can distinctly affect the value of the claim.

Q: Well, they would make the value go up.

A: That's right.

Q: All right. So, therefore, in order to be fair and to make certain that you deal fairly and offer the claimant a fair sum of money if that person is not represented by a hot rodder or somebody that's got a big reputation, someone that's only tried two personal injury cases to a verdict in his entire life, is not recognized in a degree of competency by either State Bar certification or otherwise,

then you'd want to take that into consideration and before you made a claim offer, wouldn't you?

A: It would be a factor among the numerous on my little laundry list you referred to, yes.

\*     \*     \*     \*     \*     \*

Q: It's a lot easier to cut a deal that may not be as fair as it should be to an injured party if they're represented by a person that's not experienced in personal injury or wrongful death law, Yes, sir?

A: That's a fair assumption, yes.

10. Quoting again from Plaintiff's exhibit 2:

We're concerned our driver may have pulled out to pass his preceding co. employee, realized there wasn't adequate distance braked and then jackknifed. This, if a plaintiff (abbreviated) could prove, constitutes possibly gross negligence and opens the door for punitive. Claimant (abbreviated) attorney (abbreviated) hasn't mentioned this so far.

fied by resort to the statute. This Court *refuses* to allow *the jury* to consider Paula's claim, based on difficult to verify representations, even though this case involves the disparity in knowledge between the adjustors and *a 15 year old girl.* It does so in the face of evidence that Transport discouraged competent investigation of its difficult to verify statements. The facts may be distinguishable but the rule of law is not.

It is true that none of the defendants withered under cross examination and admitted that they intended to defraud Paula. That type of proof is seldom available. Even so, any ultimate fact may be proven by circumstantial evidence. Our own precedents recognize that any claim of fraud will almost necessarily depend upon circumstantial evidence. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986). Our fraud jurisprudence *allows* us to make reasonable inferences from circumstantial evidence; no evidence review *requires* it. The adjudicators who came before us, either with knowledge of the law or with proper instructions upon it, found the taint of fraud in this disputed transaction. This court now pronounces that no reasonable person could peruse this evidence and come to any conclusion but that fraudulent misrepresentation did not occur. The law does not require (and does not allow) such a conclusion.

The court's opinion purports to hold that under traditional tort jurisprudence and under the application of the traditional standards of review, there is no evidence of fraud. I believe the Court has improperly defined fraud, and I believe it has improperly applied no evidence review to its faulty definition. I believe the general law of torts would allow recovery based upon misrepresentations of value where there is both a gross disparity of knowledge and where the defendant, through artifice or trickery, has attempted to limit the plaintiff's sources of information. Reasonable persons could (and reasonable persons have) come to differing conclusions under the evidence in this record, and we are simply not entitled to rely upon evidence and inferences in derogation of the verdict to dilute the evidence upon which the finder of fact was entitled to rely. Therefore, I dissent.

SPECTOR, Justice, dissenting.

The record in this case contains more than a scintilla of evidence that Transport Insurance Company defrauded Paula Faircloth in the course of settling her claim arising from the death of her mother and stepfather. For that reason, I would modify the judgment of the court of appeals to allow Faircloth to recover on the basis of common-law fraud.