Opinion issued March 10, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00417-CV

———————————

Anglo-Dutch Petroleum International, Inc., Appellant

V.

Shore
Harbour Capital Management Corporation, Appellee



 



 

On Appeal from the 333rd District Court

Harris County, Texas



Trial Court Case No. 2004-48053

 



 

MEMORANDUM OPINION

          Anglo-Dutch
Petroleum International, Inc. appeals the trial court’s judgment awarding Shore
Harbour Capital Management Corporation $100,000, plus pre- and post-judgment
interest on its claim for fraud.  Shore
Harbour alleged that Anglo-Dutch made a fraudulent misrepresentation to
persuade Shore Harbour to invest in a project with Anglo-Dutch.  On appeal, Anglo-Dutch contends that the
trial court erred by ruling in Shore Harbour’s favor on its fraud claim
arguing, among other things, that the claim was barred as a matter of law
because the alleged misrepresentation was an expression of an opinion.  We agree, and we reverse and render judgment
that Shore Harbour take nothing on its fraud claims.

I.                 
Factual and procedural background

The facts underlying this case span
nearly two decades, involve multiple transactions related to the development of
a foreign oil and gas field, and relate to numerous lawsuits involving
Anglo-Dutch.  For the purposes of this
appeal, the following facts are relevant.

Anglo-Dutch Petroleum
International, Inc. was a partner in Anglo-Dutch Kazakhtenge (ADK), which
itself was a partner in a joint enterprise to develop an oil and gas field in
Kazakhstan, called the Tenge Joint Enterprise. 
The other joint-enterprise partner was the national oil company of
Kazakhstan.  Anglo-Dutch wanted to buy
out its ADK partners and required working capital to finance its expenses
related to this transaction.  

Shore Harbour considered a proposal
to contribute capital to Anglo-Dutch to facilitate the buy-out
transaction.  In making its decision to
contribute, Shore Harbour relied on oral conversations between its managing
shareholder, Don Chamberlin, and Anglo-Dutch’s president, Scott Van Dyke.  Shore Harbour also relied upon a prospectus
received from Anglo-Dutch.  In the
initial letter Anglo-Dutch sent to Shore Harbour, Van Dyke stated: 

As
we discussed, Anglo-Dutch is in the final stages of buying its current
partners’ interests in the Tenge Field. 
Anglo-Dutch is buying the interests of . . . a subsidiary of . . . the
national oil company of Taiwan, and the interests of some other smaller
partners.  Funds are being raised from
Franklin Natural Resource Fund, InterCapital Investments, Inc., and from an
individual in Pennsylvania.

 

Anglo-Dutch attached a copy of the proposed Profit
Distribution Agreement with the prospectus. 
The agreement stated:

Anglo-Dutch is attempting to
purchase ADK’s 50% interest in the Tenge JE. 
At Closing . . . Anglo-Dutch intends to assign the ADK interest to a
newly formed company (herein referred to as “Eur-Oil”).  To fund its purchase of the ADK interest and
to raise additional development capital for the Tenge JE, Anglo-Dutch intends
to sell a portion of Eur-Oil to one or more companies at Closing. 

 

The agreement specifically states that conveyance of
a percentage interest of up to 0.25% of the revenue from the Tenge Field would
occur at the closing of the deal to buy out ADK’s partners.  It also specifies that, “in the event Closing
occurs,” Shore Harbour’s initial contribution of $25,000 would be returned
within one year of closing.  Finally, the
agreement requires both parties to take all actions “necessary to effectuate
the intent and purpose of this Agreement and carry out the transaction as
contemplated herein.”

Two days after Chamberlin had his
first conversation with Van Dyke, he signed the agreement on behalf of Shore
Harbour.  Shore Harbour contributed a
total of $100,000 to Anglo-Dutch pursuant to the Profit Distribution
Agreement.  Chamberlin never asked to see
any documentation about Anglo-Dutch’s proposed buy-out transaction.  Van Dyke testified that he encouraged
Chamberlin to visit a Houston data room that held all the documentation Van
Dyke had collected pertinent to the Tenge Field.  The data room included information pertaining
to geology, engineering, production, governmental licenses and interactions,
and correspondence from partners and investors or potential investors.  Van Dyke testified that he filed all
documents pertaining to the Tenge Field and the Tenge Joint Enterprise in the
data room.  Chamberlin testified that he
could not recall if Van Dyke had invited him to see the data room, but both
parties agree that Chamberlin never visited the data room or reviewed the
information included there.

At trial, Chamberlin, who was also
an investment advisor by trade, testified that he knew he was making an investment,
not a loan, but he did not realize he could lose his investment if Anglo-Dutch
did not close the buy-out transaction. 
Chamberlin contended in the trial court, as he does in this appeal, that
Van Dyke represented to him that the deal would close.

The deal did not close.  In violation of a confidentiality agreement,
a third party misused information gained from Anglo-Dutch’s data room and
purchased the interests of Anglo-Dutch’s partners.  Anglo-Dutch initiated litigation over the
breach and attempted to block the sale. 
When that was unsuccessful, Anglo-Dutch sought damages representing the
value of the data itself as well as the lost opportunity.  Anglo-Dutch prevailed in that lawsuit and
later reached a settlement with one party, but Anglo-Dutch’s recovery was far
less than the damages it sought.  Shore
Harbour demanded repayment of its $100,000 contribution, but Anglo-Dutch did
not refund Shore Harbour’s money.

Instead, Anglo-Dutch filed suit seeking
a declaration of the parties’ rights under the contract.  Shore Harbour countersued, alleging fraud and
fraudulent inducement, among other things. 
Relying on Shore Harbour’s discovery responses, the trial court limited
Shore Harbour’s fraud and fraudulent inducement claims at trial to a single
alleged misrepresentation by Anglo-Dutch, specifically that “the deal would
close.”  After a bench trial, the trial
court awarded Shore Harbor $100,000 on its fraud claim, plus pre- and
post-judgment interest.  In its sole
issue, Anglo-Dutch contends that the trial court erred by ruling in Shore
Harbour’s favor on its fraud claim because the alleged misrepresentation was
not the kind of statement for which a cause of action for fraud may be pursued.

II.              
Standards of review

Anglo-Dutch requested findings of
fact and conclusions of law before the interlocutory ruling on Shore Harbour’s
fraud claims and before the final judgment in this case.  The appellate record does not include a
notice of past due findings of fact and conclusions of law, see Tex.
R. Civ. P. 297, and Anglo-Dutch does not challenge the trial court’s
failure to make findings of fact on appeal. 
Because the trial court did not issue findings of fact and conclusions
of law, “all facts necessary to support the judgment and supported by the
evidence are implied.”  BMC Software Belg., N.V. v. Marchand, 83
S.W.3d 789, 795 (Tex. 2002).  Thus we
presume that the trial court resolved all factual disputes in favor of its
judgment.  See Tri-State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P., 184
S.W.3d 242, 246 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing American Type Culture Collection, Inc. v.
Coleman, 83 S.W.3d 801, 806 (Tex. 2002)).  These findings are not conclusive when the
appellate record includes both reporter’s and clerk’s records, and they may be
challenged for legal and factual sufficiency on appeal.  Id.  To the extent that the underlying facts are
undisputed, however, we conduct a de novo review.  Glattly
v. CMS Viron Corp., 177 S.W.3d 438, 445 (Tex. App.—Houston [1st Dist.] 2005,
no pet.).  We review de novo a trial
court’s implied conclusions of law.  See BMC
Software, 83 S.W.3d at 794.

In reviewing the legal sufficiency
of the evidence, we view the evidence in the light most favorable to the fact
finding, crediting favorable evidence if reasonable persons could, and
disregarding contrary evidence unless reasonable persons could not.  City of
Keller v. Wilson, 168 S.W.3d 802, 807 (Tex. 2005).  We must sustain a legal sufficiency point:
(1) when there is a complete absence of a vital fact; (2) when rules of law or
evidence preclude according weight to the only evidence offered to prove a
vital fact; (3) when the evidence offered to prove a vital fact is no more than
a scintilla; or (4) when the evidence conclusively establishes the opposite of
the vital fact.  El-Khoury v. Kheir, 241 S.W.3d 82, 86 (Tex. App.—Houston [1st
Dist.] 2007, pet. denied) (citing City of
Keller, 168 S.W.3d at 810 & nn. 15–16 (Tex. 2005)). “The final test for
legal sufficiency must always be whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review.”  City of
Keller, 241 S.W.3d at 827.

III.          
Analysis

Shore Harbour alleged causes of
action for fraud and fraudulent inducement. 
Its theory of the case was that Anglo-Dutch falsely misrepresented that
the deal to buy out its ADK partners “would close,” thereby inducing Shore
Harbour to enter into the Profit Distribution Agreement.  

The elements of fraud are:
(1) that a material representation was made; (2) that it was false;
(3) that, when the speaker made it, he knew it was false or made it
recklessly without any knowledge of its truth and as a positive assertion; (4) that
he made it with the intention that it should be acted upon by the party; (5) that
the party acted in reliance upon it; and (6) that he thereby suffered
injury.  Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962
S.W.2d 507, 524 (Tex. 1998); Trenholm v.
Ratcliff, 646 S.W.2d 927, 930 (Tex. 1983).  Fraudulent inducement is “a particular species
of fraud that arises only in the context of a contract and requires the
existence of a contract as part of its proof.”  Haase v.
Glazner, 62 S.W.3d 795, 798 (Tex. 2001).

An actionable misrepresentation is
one concerning a material fact; a pure expression of opinion will not support
an action for fraud.  Trenholm, 646 S.W.2d at 930.  Whether a statement is an actionable statement
of “fact” or merely one of “opinion” often depends on the circumstances in
which a statement is made.  Transport Ins. Co. v. Faircloth, 898
S.W.2d 269, 276 (Tex. 1995).  Among the
relevant circumstances are the statement’s specificity, the speaker’s
knowledge, the comparative levels of the speaker’s and the hearer’s knowledge,
and whether the statement relates to the present or the future.  Id.  An opinion may constitute fraud if the
speaker has knowledge of its falsity.  Trenholm, 646 S.W.2d at 930.  An opinion about a future event may also
constitute fraud where the speaker purports to have special knowledge of facts
that will occur or exist in the future.  Id. 
Finally, “[a] promise of future performance constitutes an actionable
misrepresentation if the promise was made with no intention of performing at
the time it was made.”  Formosa Plastics Corp. USA v. Presidio Eng’rs
& Contractors, 960 S.W.2d 41, 48 (Tex. 1998).  But the mere failure to perform a contract is
not evidence of fraud.  Id.

By its judgment in favor of Shore
Harbour on its fraud claims, the trial court impliedly concluded that the
alleged misrepresentation that “the deal would close” was actionable as a matter
of law.  On appeal, Anglo-Dutch argues
that the alleged statement was an expression of opinion and not actionable as a
matter of law.  We review this contention
de novo.  See BMC Software, 83
S.W.3d at 794.  In accordance with the
principles outlined above, we specifically consider the circumstances in which
that statement was made, the speaker’s knowledge of the alleged falsity, any
special knowledge the speaker may have had of future facts, and whether a
promise to perform had been made with no intention of performing it.

Circumstances
in which the statement was made.  Chamberlin
testified that in their initial conversation, Van Dyke said that Anglo-Dutch
was trying to buy out its partners and needed money for transaction costs.  Chamberlin asserts that Van Dyke told him
that the deal would close during this conversation, in which they discussed the
proposed Profit Distribution Agreement. 
The agreement itself, which Van Dyke sent to Chamberlin later that day,
explained that Anglo-Dutch was “attempting” to buy out its partners.  The contract describes a bargain in which
Chamberlin would give Anglo-Dutch money in exchange for the contingent rights
to receive repayment of the initial contribution and a percentage of revenue if
Anglo-Dutch successfully closed its buy-out transaction.  The agreement required that Anglo-Dutch “do
all such further acts . . . as may be necessary to effectuate the intent and
purpose of this Agreement and carry out the transaction as contemplated
herein.”

Both parties agreed that Anglo-Dutch
had a data room in Houston pertaining to the Tenge Field and that no
representative from Shore Harbour ever visited the data room.   They also agreed that this was an
arms-length transaction.  See DRC Parts & Accessories, L.L.C. v. VM
Motori, S.P.A., 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003,
pet. denied) (“[A] party to an arm’s length transaction must exercise ordinary
care and reasonable diligence for the protection of his own interests, and a
failure to do so is not excused by mere confidence in the honesty and integrity
of the other party.”).  The unrefuted
evidence at trial was that all documents relevant to the project were kept in
the data room, including the information that Shore Harbour now contends
Anglo-Dutch should have but failed to disclose. 
Chamberlin was an experienced investor, and he testified that he should
have asked more questions.  The
circumstances all suggest that the alleged representation that the transaction
“would close” would be most properly understood as an expression of Van Dyke’s
opinion and not a representation that a future event certainly would occur.

Knowledge
of falsity.  Van Dyke
testified that he believed the statement in his letter to Shore Harbour,
“Anglo-Dutch is in the final stages of buying its current partners’ interests
in the Tenge Field,” was true at the time he wrote it.  He testified that he had been working to
acquire Anglo-Dutch’s partners’ interests for two to three years before Shore Harbour
signed the Profit Distribution Agreement, that he had been exchanging proposed
contracts with the partners, and that he had no reason to doubt that they would
sell to Anglo-Dutch because it had the only data room pertaining to the Tenge
Field.  He also had been negotiating with
three other potential investors listed in his letter to Shore Harbour.  Nothing in the record contradicts Van Dyke’s
testimony on these matters.  See El-Khoury, 241 S.W.3d at 86 (noting
that court must sustain legal sufficiency challenge when evidence conclusively
establishes the opposite of the vital fact); see also Tri-State Bldg.
Specialties, Inc., 184 S.W.3d at 246 (holding that implied findings of fact
may be challenged for legal sufficiency).

Chamberlin testified in his deposition
that he believed Van Dyke had answered his questions truthfully when they
initially spoke.  At trial Chamberlin
said that he later found out that Van Dyke had been untruthful, but he also
testified that he stood by his deposition testimony, in which he said that Van
Dyke had been truthful but he had not asked the right questions.  Accordingly, assuming that Van Dyke did tell
Chamberlin that the deal would close, the evidence at trial could not have
supported a conclusion that Van Dyke, acting on behalf of Anglo-Dutch, knew
that this statement was false or that he made it recklessly without knowledge
of its truth or falsity.  Likewise, the
evidence did not support a conclusion that Anglo-Dutch promised to close the
deal with no intention of doing so.

Special knowledge
of future facts.  Nothing in
the record suggests that Van Dyke purported to have special knowledge of facts
that would occur or exist in the future. 
Van Dyke testified extensively about his knowledge and work regarding
the Tenge Field.  For example, he
testified that he spent two years doing his own due diligence and analysis
before initially deciding to invest.  He
compiled all of his information and documentation regarding the Tenge Field
into a data room in Houston.  He
testified that the data room contained the production histories of the existing
wells, seismic data, governmental contracts, engineering designs of surface
facilities, correspondence with partners and governmental agencies, and
licenses.  Van Dyke testified that the information
was organized in file cabinets and available for review by potential
investors.  None of this evidence of
Anglo-Dutch’s accumulated knowledge, however, shows that it purported to have
the kind of special knowledge of future events necessary to make Van Dyke’s
opinion about the future closing of a transaction actionable as a fraudulent
misrepresentation.  See Trenholm,
646 S.W.2d at 930.  

Shore Harbour argues that Van
Dyke’s failure to mention then-existing facts transformed his opinion about a
future event into a representation of fact. 
For example, Shore Harbour argues that Van Dyke failed to disclose
existing tax liabilities and threats by the Kazakh government to revoke the
Tenge JE’s license.  However, Shore
Harbour’s fraud claim was limited to the single misrepresentation allegation
disclosed in discovery, i.e., that the deal would close.  Accordingly, the trial court could not have
ruled in Shore Harbour’s favor on a fraud-by-omission theory, and we do not
imply such a conclusion.

Conclusion

Shore Harbour presented no evidence
that the alleged statement was made with knowledge of its falsity, that Van
Dyke purported to have knowledge of specialized facts not available to
Chamberlin or Shore Harbour, or that Van Dyke (on behalf of Anglo-Dutch)
promised to take action to carry out the transaction without the intent to do
so.  Under these circumstances, we
conclude that the alleged statement, if made, was an expression of
opinion.  We therefore hold that it
cannot, as a matter of law, be the basis of a cause of action for fraud.  We sustain Anglo-Dutch’s sole issue.

We reverse the judgment of the
trial court and render judgment that Shore Harbour take nothing by its claims.

 

 

 

                                                                   Michael
Massengale

                                                                   Justice


 

Panel
consists of Justices Keyes, Sharp, and Massengale.