

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00133-CV

NATIONAL WESTERN LIFE
INSURANCE COMPANY

APPELLANT AND APPELLEE

V.

SHEILA NEWMAN

APPELLEE AND APPELLANT

----------

### FROM THE 415TH DISTRICT COURT OF PARKER COUNTY

----------

## MEMORANDUM OPINION ON REHEARING[1]

----------

We have considered Appellee Sheila Newman's motion for rehearing. We deny the motion but withdraw our August 11, 2011 opinion and judgment and substitute the following.

Appellant National Western Life Insurance Company (National Western) appeals the trial court's judgment against it for the fraudulent acts of its agent,

---

[1]*See* Tex. R. App. P. 47.4.

Lynn Strickland, Jr., upon appellee Shelia Newman. Newman filed a cross-appeal, however, for ease of reading, we will refer to National Western as the appellant and Newman as the appellee. We will reverse the trial court's judgment and render judgment that Newman take nothing.

## I. Background Facts

In late 2005, Newman decided to invest a large amount of her savings. She was uneducated in investing so she researched companies online and chose to purchase an annuity from National Western because "[i]t was a reputable company that had been in business for many years." Newman called National Western, who told her an agent would contact her.

Soon after, Strickland called Newman and made an appointment to speak with her at her home. Strickland told Newman that if she invested $200,000, she could live off the interest received. He also told her that if she invested that amount, she would receive a $20,000 bonus. Strickland gave Newman a business card with his phone number and told her to call him when she had decided whether to invest.

In November 2005, Newman phoned Strickland and agreed to the $200,000 amount. Strickland told her to get two cashier's checks, one for $75,000 and another for $125,000. He also told Newman to make both checks out to Lone Star Financial "in order for him to be able to handle the money." Lone Star Financial is owned by Strickland. In January 2006, Strickland went to Newman's house, where he gave her a two-page application for the annuity. The

2

first page contained a section for Newman's personal information, which she filled out.  The first page also contained blanks for identifying the type of plan, the beneficiary, and a blank for the amount of money submitted with the application. Newman left the amount blank because Strickland "was in a hurry that day . . . and [she] trusted that he would take care of it."  At the bottom of the first page was the following statement:

> I have read the statements above and to the best of my knowledge and belief they are true and correct.  Any statement made by either the agent of this application or by any other person shall not be binding on [National Western] unless such statement is reduced to writing by [National Western] and made a part of the annuity contract.  I have received and read a copy of the annuity information brochure and understand the features of the plan of insurance applied for.

Below that, Newman and Strickland signed the application.  The back page of the application contained only one short section entitled "Agent's Section," where Strickland signed, and under that, in bold, the statement, "***ALL CHECKS MUST BE PAYABLE TO NATIONAL WESTERN LIFE INSURANCE COMPANY***."  Strickland was also supposed to give Newman a document titled "Consumer Disclosure Signatures."  That document contained the statement, "If you have any questions after you receive your annuity Policy, please contact your agent or call *National Western's Customer Service Department at 1-800-922-9422*.  We want to be sure that you read all 10 pages of this Disclosure and are aware of the benefits and features explained herein."  Newman's initials were next to the statement that the policy had been explained to her, and Newman's

and Strickland's signatures were under the statement that she had received a copy of the Disclosure and had reviewed it with her agent. Newman testified at trial that she did not recall ever seeing the disclosure and that her signature on it was forged.

Strickland later deposited the $75,000 check into Lone Star Financial's account. Strickland filled out the amount section of Newman's application for $125,000 and endorsed the $125,000 check over to National Western. National Western, in turn, issued Newman a policy in the amount of $125,000. National Western sent Strickland a copy of the insurance policy for him to hand-deliver to Newman.

Between January 2006 and December 2007, Newman drew on the annuity a number of times. She also received checks from National Western, some that she received in the mail and some that she claims were hand-delivered by Strickland, although they were all addressed to her. Newman claims she never received an annual statement or interest statement, although they were also sent to her home address. Newman testified she tried for several years to get a copy of her policy from Strickland, but he would give her excuses and cancel appointments. When she threatened to go to National Western, he told her not to call the company directly because "they would not have the information and it would be confusing."

Finally in December 2007, Newman complained to National Western that she never received a copy of her $200,000 policy. National Western told

4

Newman that her policy was only for $125,000. National Western contacted Strickland about Newman's complaint. He responded that "the amount of the annuity Mrs. Newman bought was for [$]125,000. I talk to Mrs. Newman about 2 or 3 times a month[.] She never complained about anything . . . ." Strickland provided National Western with a copy of the delivery receipt, purportedly signed by Newman, stating that she had received the copy of her policy on February 6, 2006. At trial, Newman denied receiving the copy National Western sent in 2006 and claimed her signature on the receipt was forged. National Western sent Newman a letter reaffirming receipt of only the $125,000 check, and provided her a copy of the check and another copy of her policy. After Newman's complaint that she did not receive her policy, National Western terminated Strickland's contract. Newman demanded that National Western reimburse her $200,000. National Western refused.

Newman filed suit against Strickland and National Western. After striking Strickland's answer as sanctions for failing to appear at scheduled depositions, the trial court rendered judgment against Strickland, awarding Newman treble damages under the Deceptive Trade Practices Act. See Tex. Bus. & Com. Code Ann. §§ 17.46, 50 (West 2011). The case against National Western proceeded to a jury trial.

After hearing the evidence, the jury made the following relevant findings:

(1) Strickland had authority to act for National Western.

5

(2)   Strickland knowingly engaged in false, misleading, unfair, or deceptive acts or practices that Newman relied on to her detriment.

(3)   Strickland committed fraud against Newman.

(4)   Strickland was not an independent contractor.

(5)   National Western had the right to control Strickland with respect to Strickland's fraudulent acts.

(6)   National Western ratified Strickland's conduct.

(7)   Newman's damage resulted from gross negligence attributable to National Western.

The jury awarded actual damages of $112,736.49 ($200,000 plus a $20,000 bonus less the amount Newman withdrew on the policy). At the bifurcated punitive damages phase, the jury found clear and convincing evidence that Newman's damages "resulted from gross negligence" and awarded Newman $150,000,000 in punitive damages. Newman elected to recover for fraud, and the trial court entered judgment on the verdict for the actual damages awarded and prejudgment interest, attorney's fees, and the punitive damages found by the jury.

National Western filed both a motion for judgment non obstante veredicto and a motion for new trial. The trial court refused to rule on each of these motions. This appeal followed.

## II. Discussion

### A.  Jury Question One

6

All of Newman's claims against National Western were predicated on its position that Strickland was acting within the scope of authority that binds National Western. Our analysis of National Western's issues is complicated by the trial court's submission of Jury Question One:

> Did Lynn Strickland, Jr. have the authority to act for National Western Insurance Company?
>
> **Actual authority** for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party to act on behalf of [National Western]. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.
>
> **Apparent authority** exists if a party (1) knowingly permits another to hold himself out as having authority to act on behalf of another, in this case, [National Western] or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to act on behalf of [National Western] to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority of another to act for the party exists. When a person has notice of the limitations of an actor's authority, then that such person cannot detrimentally rely on the apparent existence of the authority of the actor to act for the party.

National Western objected to this question:

> Judge, we object to Jury Question No. 1. The defendant believes that this particular question, the way it's phrased, applies to only the general grant of authority given an agent in the normal course of his business in which it carries out those implied duties and in-kind things as authorized.
>
> We believe that it needs to include specific acts such as "deposited the money into his account for his own use." Otherwise, if we do not—if we word it this way, what will happen is—the practical effect is we will stand up and say—and they will as well—

7

that the contract between the agent and National Western let him solicit the contract and collect monies.

When you do that, they're going to jump up and say "We win automatically almost as a matter of law because he can do those things." But he couldn't take the money for his own use which is what this case is about. So what we'll have to argue to the jury is "Wait a minute, it says here you have the authority to act for us. But wait a minute. You're saying he wasn't authorized to take the money for his own use." That's incongruent with what is in this question.

Newman contends that National Western's objections at trial to Jury Question One were confusing and limited only to apparent authority. As a result, Newman argues National Western did not properly preserve its complaint concerning Jury Question One as an issue for appeal. However, the above-quoted objections contain no such limitation.

The real question before us is not whether there was a proper objection to the charge; instead, the question is what is the import of the jury's answer to that question. The fact that Strickland had authority to act for National Western was never in doubt. National Western and Strickland had a contract that specifically authorized Strickland to procure applications and collect monies on behalf of National Western. Jury Question One is immaterial to any element of Newman's causes of action, and the jury's answer lends nothing to establish liability on the part of National Western. The question fails to assist Newman in establishing National Western's liability because it fails to connect any authority Strickland had to the injury-producing acts that the jury found Strickland to have committed. *See Gaines v. Kelly*, 235 S.W.3d 179, 184 (Tex. 2007) ("The relevant issue . . . is

8

not merely the existence of an agency relationship, but rather the scope of that agency."). Jury Question One and its answer cannot be considered as contributing anything to the basis of this judgment or the outcome of this appeal.

National Western claims throughout its argument on appeal that there is no evidence to support any finding that it authorized Strickland's misdeeds, controlled his fraudulent actions, or ratified his conduct after the fact. Despite our conclusion that the submission of Jury Question One serves no useful purpose, we will address National Western's legal sufficiency challenge to the questions contained in the court's charge that are relevant to Newman's causes of action.

## B. Strickland had no authority to bind National Western through his fraudulent acts.

The law does not presume agency. *Tex. Cityview Care Ctr., L.P. v. Fryer*, 227 S.W.3d 345, 352 (Tex. App.—Fort Worth 2007, pet. dism'd). The party alleging agency has the burden to prove its existence. *Id*. An agent must have the authority (either actual or apparent) to bind the principal. *Id*. Thus, absent a showing that Strickland had the authority to bind National Western through his actions, or a showing that National Western ratified Strickland's conduct after the fact, National Western cannot be liable for Strickland's fraud.

An agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority). *Gaines*, 235 S.W.3d at 182. Actual authority is authority that the principal intentionally confers upon the agent,

9

or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess. *Tex. Cityview Care Ctr.*, 227 S.W.3d at 352. Apparent authority is based on estoppel, arising either from a principal knowingly permitting an agent to hold himself out as having authority or by a principal's actions which lack such ordinary care as to clothe the agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise. *Gaines*, 235 S.W.3d at 182.

### 1. Actual authority

We first address Newman's argument that National Western did not preserve error as to actual authority. A no-evidence point is preserved through any one of the following: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the issue to the jury; (4) a motion to disregard the jury's answer to a vital fact issue; or (5) a motion for new trial. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992). National Western filed a motion for directed verdict on the issue of actual authority, a motion for new trial, and a motion for judgment notwithstanding the verdict. Even if National Western did not preserve error by properly objecting to the jury charge as Newman claims, it has sufficiently preserved its issue of actual authority for our review.

In its first issue, National Western argues that there is no evidence to support the jury's finding that Strickland had the authority to act for National Western when he committed fraud. We may sustain a legal sufficiency challenge

10

only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

The jury made an affirmative finding that Strickland had the authority to act for National Western. As stated above, the contract between Strickland and National Western established that Strickland did have authority to act for National Western. Specifically, he had the authority to "procure applications for insurance and annuity contracts" by virtue of his contract with National Western.[2] This,

---

[2]Newman argues that Strickland was a managing general agent of National Western as defined in chapter 4053 of the insurance code because his contract with the company is titled "General Agent Manager Contract and Schedule of Commissions." *See* Tex. Ins. Code Ann. § 4053.001(3) (West 2009) (defining managing general agent). A managing general agent may "accept or process on the insurer's behalf insurance policies produced and sold by other

11

however, is not sufficient to establish liability for Strickland's fraud. That is, the mere fact that Strickland had *some* authority to act for National Western does not establish that Strickland's fraud was within the scope of that authority. *See Gaines*, 235 S.W.3d at 184 ("The relevant issue then is not merely the existence of an agency relationship, but rather the scope of that agency."). The same contract which established Strickland's authority also explicitly limited that authority to what was "expressly stated in [the] contract" and specifically forbade Strickland from, among other things, "perpetrat[ing] any fraud against [National Western], our policyholders, prospective policyholders or applicants." The contract explicitly stated that all monies collected by Strickland belonging to National Western would be held in a fiduciary trust, not used for any personal purpose, and would be immediately paid to the principal. In other words, Strickland's actual authority did not extend beyond procuring contracts for National Western and accepting payment to be sent to National Western.

Newman argues that Strickland's fraudulent acts were incidental to his authorized duties, and thus should be attributable to National Western. As the supreme court has said, "In determining a principal's vicarious liability, the proper question is not whether the principal authorized the specific wrongful act; if that were the case, principals would seldom be liable for their agents' misconduct."

agents." *Id*. Chapter 4053, however, does not apply to "life, health, and accident insurance, including variable life insurance and variable annuity contracts." *Id*. § 4053.003(1) (West 2009). Any argument Newman makes that chapter 4053 imbued Strickland with the actual authority to defraud is without merit.

*Celtic Life Ins. Co. v. Coats*, 885 S.W.2d 96, 99 (Tex. 1994). Therefore, the proper test for actual authority is whether the agent's acts were within the course and scope of his agency. *Id.*; *Lyon v. Allsup's Convenience Stores, Inc.*, 997 S.W.2d 345, 347 (Tex. App.—Fort Worth 1999, no pet.). "If an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation." *Lyon*, 997 S.W.2d at 347 (holding that employee's defamation and intentional infliction of emotional distress were deviations from employee's duties and were not done in the furtherance of employer's business); s*ee also Gaines*, 235 S.W.3d at 185 ("Because an agent's authority is presumed to be co-extensive with the business entrusted to his care, it includes only those contracts and acts incidental to the management of the particular business with which he is entrusted."). For an employee's acts to be within the scope of employment, the conduct must be of the same general nature as that authorized or incidental to the conduct authorized. *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 579 (Tex. 2002) (holding that employer was not liable for employee's defamation of other employee because it was not furthering employer's business or accomplishing a purpose of employee's job); *Millan v. Dean Witter Reynolds, Inc.*, 90 S.W.3d 760, 767–68 (Tex. App.—San Antonio 2002, pet. denied) (holding that investment company was not vicariously liable for broker's embezzlement from client that in no way related to his authorized duties and, thus, greatly exceeded the scope of his authority); *Lyon*, 997 S.W.2d at 347. In cases involving serious criminal

13

activity, an employer is not liable for intentional and malicious acts that are unforeseeable considering the employee's duties. *Millan*, 90 S.W.3d at 768.

In a postsubmission letter brief, Newman relies on *Coats* for her proposition that liability attaches because National Western authorized Strickland to make representations on its behalf. But the facts of *Coats* are not analogous to the present case. In *Coats*, the agent of the insurance company misrepresented the benefits of the insurance policy he sold. 885 S.W.2d at 97. The jury found that that the agent had authority to explain, on the company's behalf, the benefits of the policy. *Id*. at 99 ("The misrepresentation . . . was made in the course of explaining the terms of the policy—a task the jury specifically found to be within the scope of Harrell's authority."). The jury also found that the agent did not make the misrepresentations knowingly. *Id*. The agent in *Coats* was within the scope of his authority at the time of the injury-producing act and furthered the purpose of his agency. Here, Strickland's misconduct took place outside the authority granted him by National Western. He did not exceed his authority when he described the terms of the annuity policy. Unlike the agent in *Coats*, he could have delivered exactly what he promised. Strickland's wrongful acts did not further his principal's business.

Other cases provide more guidance. In *Morrow v. Daniel*, 367 S.W.2d 715, 718 (Tex. App.—Dallas 1963, no writ), the court held that although the agent was acting within the scope of his employment when he fraudulently induced the plaintiff into purchasing stock in the principal's company, he was not

14

acting as an agent when he told the principal that the plaintiff was not purchasing stock, gave plaintiff forged stock certificates, and used the plaintiff's money for his own purposes. In the first act of fraud (inducing the plaintiff to purchase stock), the agent's acts were in the furtherance of the principal's business—namely, selling stock and funding the corporation. The second act of fraud, however, was fraud on the principal as well as the plaintiff. *Id.* at 716.

Similarly, in *Millan*, the agent was a broker whose authority permitted him to "open [brokerage] accounts for clients, receive deposits to these accounts, and purchase and sell securities as directed by clients." 90 S.W.3d at 768. The agent took deposits made by his client (who was also his mother), deposited them into a fictitious account, withdrew on that account, and stole his client's statements to hide his fraud. *Id.* at 763. The court of appeals in that case held that the agent's fraudulent acts were not in the scope of his authority and were not related to his duties. *Id.* at 768.

Like the agents in *Morrow* and *Millan*, Strickland was authorized to accept payment from the principal's customers. And like the agents in *Morrow* and *Millan*, Strickland was not authorized to retain the funds he received for his personal use. Nor could Strickland's acts be considered to be in furtherance of National Western's business or accomplishing his job because National Western was deprived of the money which Strickland retained. There is a distinction between defrauding a customer to reap a benefit for the principal and defrauding a customer to reap a benefit for oneself. *Compare Coats*, 885 S.W.2d at 99

15

(holding that agent's misrepresentation was made in the course of his authorized duty to secure policies for his principal) *with Minyard Food Stores*, 80 S.W.3d at 579 (employee's defamation of coworker during investigation, in which he was required to participate, did not further employer's business or accomplish the purpose of his job). When Strickland deviated from his duty to accept payment on behalf of National Western, he did so solely for his own personal gain.

Newman notes that the jury found in two questions that Strickland was not an independent contractor and that National Western retained the right to control Strickland's actions. However, the scope of Strickland's authority is set forth in his contract with National Western. "A contract expressly providing that a person is an independent contractor is determinative of the relationship absent evidence that the contract is a mere sham or subterfuge designed to conceal the true legal status of the parties or that the contract has been modified by a subsequent agreement between the parties." *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911 (Tex. App.—Fort Worth 2009, pet. denied) (citing *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 588–90, 592 (Tex. 1964)). Newman does not point to any evidence to support the jury's findings, or to support any finding that the contract between National Western and Strickland was a sham designed to conceal the true status of the parties to the contract or that the contract had been subsequently modified. To the contrary, Newman testified that Strickland informed her that he was an independent contractor. She further testified that at the time she signed the contract, she understood that statement

16

on the application which said that Strickland's statements were not binding on National Western until reduced to writing by National Western in the annuity policy.

Further, Newman does not claim that National Western retained the right to control how Strickland procured applications or accepted payments. Instead, Newman focuses on the fact that National Western's referral procedure resulted in Strickland being sent to Newman's home. The referral to Newman's home was not, however, the injury-producing event. *See Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993) (noting that in determining whether duty exists in retained control cases, focus is on whether retained control was specifically related to the alleged injury). Had Strickland performed his duties consistent with his contract after being referred to and meeting with Newman, there would have been no fraud. An entity's liability must arise from its own injury-causing conduct. *Id*. The injury-producing event occurred when Strickland convinced Newman to write two checks to his company instead of National Western; sign an application with critical information (*i.e.*, the amount of the policy) left blank; and not to contact National Western with her concerns. Because National Western did not retain control over those aspects of Strickland's job that led to Newman's injury, liability cannot be based on the right to control. We therefore hold that there is no evidence to support the jury's findings that Strickland was not an independent contractor and that National Western retained the right to control. The evidence conclusively establishes the opposite: Strickland was an independent contractor

17

and National Western did not retain the right to control Strickland's fraudulent acts. *See Newspapers, Inc.*, 380 S.W.2d at 592 ("When . . . the parties . . . have entered into a definite contract that expressly provides for an independent contract relationship and does not vest in the principal . . . the right to control the details of the work, evidence outside the contract must be produced to show that despite the terms of the primary contract the true operating agreement was one which vested the right of control in the alleged master.").

Newman points to evidence that National Western was aware of previous bad conduct by Strickland and chose to continue to employ him. Newman argues that by retaining Strickland as an agent after receiving complaints against him, National Western, by lack of ordinary care and despite the language of his contract, allowed Strickland to believe that he had the authority to request checks from customers made out to his own companies so that he could retain those funds for his own personal use and delay the delivery of contracts to conceal his wrongdoing.

The evidence presented at trial included four customer complaint files, only two of which contained complaints prior to Newman's dealings with Strickland. A customer complained in 2003 that he had not received copies of his policies. National Western investigated the complaint and refunded the customer's contributions. In 2005, another customer complained that Strickland had retained about $10,000 of her money and had told her to write a check to "Estate Services of Texas," which the customer claimed was owned by Strickland.

18

Strickland insisted that he had written her a check for the funds, wrote a new check for the amount, and claimed no knowledge of any check written to Estate Services of Texas. The customer then withdrew her complaint.

Even assuming these complaints are evidence that Strickland had retained money and withheld policies in the past, they are not evidence that National Western allowed Strickland to believe that he had the authority to retain checks from customers made out to his own companies or to delay the delivery of contracts. Nor are they evidence of Strickland's subjective belief that he had the authority to do so. *See Austin Area Teachers Fed. Credit Union v. First City Bank-N.W. Hills, N.A.*, 825 S.W.2d 795, 799 (Tex. App.—Austin 1992, writ denied) (considering testimony that the agent believed that his action was authorized in holding that implied authority existed). The complaint files show that National Western investigated all complaints and that Strickland attempted to conceal any misconduct that may have occurred by telling National Western that he had not done the complained-of acts. While there is evidence that National Western was aware of Strickland's practice of requesting checks in the name of his own company, there is no evidence that National Western acquiesced to any practice Strickland may have had of retaining the funds. Nor are the files evidence that National Western retained the right to control Strickland's actions despite the contractual language. *See Farlow*, 284 S.W.3d at 911 (noting that the exercise of control that must occur so as to convert an independent contractor to an employee "must be so persistent and the acquiescence therein

19

so pronounced as to raise an inference that at the time of the act or omission giving rise to liability, the parties by implied consent and acquiescence had agreed that the principal might have the right to control the details of the work") (quoting *Newspapers, Inc.*, 380 S.W.2d at 592).

There is no evidence that National Western intentionally conferred, or intentionally allowed Strickland to believe, or by want of ordinary care allowed Strickland to believe that he possessed the authority to defraud National Western clients or the company itself. *See Gaines*, 235 S.W.3d at 182 (holding that agent had actual authority to deliver and explain loan documents but did not have actual authority to negotiate terms of the loans); *Morrow*, 367 S.W.2d at 719 (holding that agent had authority to sell stock and accept payment but did not have authority to retain the funds he received). Nor were Strickland's acts in furtherance of his duties as an agent of National Western. Because there is no evidence of actual authority, we next turn to apparent authority.

### 2. Apparent authority

The principal's full knowledge of all material facts is essential to establish a claim of apparent authority. *Gaines*, 235 S.W.3d at 182. Only the conduct of the principal is relevant. *Id.*; *see also Zarzana v. Ashley*, 218 S.W.3d 152, 161 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("[A]ny of the agent's representations are wholly irrelevant in determining apparent authority."). The standard is that of a reasonably prudent person, using diligence and discretion to ascertain the agent's authority. *Gaines*, 235 S.W.3d at 182–83.

20

Apparent authority is not available when the other party has notice of the limitations of the agent's power. *See Douglass*, 504 S.W.2d at 779. As stated above, Newman admits that she was aware that Strickland was an independent contractor. She also testified that had she read the application, she would have known that she could not rely on Strickland's statements. That application also stated in bold, capital letters that all checks should be made out to National Western. It was incumbent upon Newman to protect herself by reading what she signed. *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 233 (Tex. 2008) (orig. proceeding). Although fraud may be an excuse to ignorance of a contract's terms in some cases, *id.*, the fraud Strickland committed on Newman was for the amount of the annuity, not the extent of his agency or ability to bind National Western. It is notice of the limitations of his agency that is relevant to the issue of apparent authority. *See Douglass*, 504 S.W.2d at 779.

Further, there is no evidence that National Western was aware that Newman had given Strickland a second check for $75,000. It is undisputed that Newman received the product that National Western received payments for—a $125,000 annuity. Newman testified that she never spoke to anyone at National Western concerning an amount until after Strickland's fraud was discovered. National Western therefore did not have the full knowledge necessary to establish apparent authority. National Western's acceptance of the $125,000 check endorsed over from Lone Star Financial is no evidence that it was aware of the second check for $75,000 that Strickland kept for himself. By Newman's

21

own admission, there was no conduct by National Western that could have reasonably led Newman to believe that National Western had authorized Strickland's actions.

To hold the principal liable, the act of the agent must be done in the furtherance of the principal's business and for the accomplishment of the object for which the agent is employed. *ITT Consumer Fin. Corp. v. Tovar*, 932 S.W.2d 147, 158 (Tex. App.—El Paso 1996, writ denied). When Strickland devised a scheme to steal money from both Newman and National Western, he far exceeded his authorized duties and was not acting in furtherance of his employment. *See Saenz v. Family Sec. Ins. Co. of Am.*, 786 S.W.2d 110, 111 (Tex. App.—San Antonio 1990, no writ) ("It is inconceivable that an employee could plan and execute a fraud upon his employer and be in the furtherance of his employment.").

To determine Strickland's apparent authority, we must examine the conduct of National Western and the reasonableness of Newman's assumptions about Strickland's authority. Newman argues that the acts of National Western we should rely upon to establish apparent authority are that National Western contracted with Strickland in the first place and "sent him to [Newman's] house" to procure an application and accept payment. This is merely evidence of the existence of an agency relationship and not of the scope of that relationship. Strickland had authority to serve as an intermediary to contact potential customers, deliver paperwork, explain product terms, and collect payment.

22

Newman entirely failed to produce evidence that connected this authorized conduct and Strickland's alleged apparent authority to misappropriate funds from both Newman and National Western. In her effort to supply that evidence, her theme was that she trusted National Western because of their reputation, and they sent Strickland to her home. All injury-causing acts or statements were attributed to Strickland and not National Western. If this level of proof were sufficient, then an insurance company could do nothing to avoid liability for the acts of rogue agents who engage in criminal acts outside the scope of their authority. Newman's subjective trust and the fact that Strickland was an agent referred as a result of her call to National Western is not sufficient evidence to support a reasonable belief that Strickland was authorized to convert funds to his personal use to the detriment of both the principal and its customer. *See Fryer*, 227 S.W.3d at 353 ("[A] party dealing with an agent must ascertain both the fact and the scope of the agent's authority, and if the party deals with the agent without having made such a determination, she does so at her own risk.").

Further, as we stated above, none of these acts were the cause of Newman's damages. Newman was injured because she followed Strickland's instructions to write two checks to Lone Star Financial, sign an incomplete application, and not contact National Western because they would not have her information. None of these directions may be attributable to National Western because there is no evidence that National Western was aware of them or authorized them. And Newman, by her own testimony, did not contact National

23

Western regarding the nondelivery of her policy. There is no evidence that National Western was aware that Newman had not received it, nor was there evidence that Newman ever informed National Western that the signed delivery receipt it received was a forgery.

There is, in sum, no evidence of any conduct by National Western that would have reasonably led Newman to believe that Strickland was authorized to defraud her. We therefore hold that the evidence is legally insufficient to support a finding of vicarious liability through actual or apparent authority. We sustain National Western's first issue.

## C. National Western did not ratify Strickland's acts.

In its second issue, National Western argues that there is legally and factually insufficient evidence to support the jury's finding that National Western ratified Strickland's fraudulent acts. "Ratification may occur when a principal, though he had no knowledge originally of the unauthorized act of his agent, retains the benefits of the transaction after acquiring full knowledge." *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980). Newman argues that because National Western did not return Newman's funds after she told them in December 2007, that her annuity should have been for $200,000, it ratified Strickland's conduct.

When Newman contacted National Western in December 2007, she told it that she had paid its agent $200,000. In response, National Western contacted Strickland. Strickland denied that he had received the additional $75,000 and

24

produced a policy receipt purportedly signed by Newman. National Western told Newman that it believed that she had only applied and paid for a $125,000 policy. It included in its letter a copy of the delivery receipt. There is no evidence in the record that Newman informed National Western that the receipt was a forgery or otherwise spoke to National Western again until she had retained counsel.

National Western had in front of it an application for a $125,000 annuity signed by Newman, a check for $125,000 signed by Newman, a receipt of the policy it believed was signed by Newman, multiple withdrawal requests on the policy signed by Newman, and two years without any complaint by Newman that she had not received her policy or her statements. In light of the information it had, we cannot say it was unreasonable for National Western to believe that Newman had contracted for, paid for, and accepted a $125,000 annuity, not a $200,000 policy as she later claimed. Nor can we say that this was enough information to rise to the level of the "full knowledge" required to establish ratification. *See Gibson v. Bostick Roofing & Sheet Metal, Co.*, 148 S.W.3d 482, 492 (Tex. App.—El Paso 2004, no pet.) (holding that principal did not ratify conduct of purported agent when he investigated the plaintiff's complaint of nonpayment, the agent told the principal that "he would take care of the payment," and the principal was never informed of the agent's fraud). There is no evidence that National Western was aware of the $75,000 check until Newman sent it to them, and after that, there was no evidence that National

25

Western knew that Newman had made the check to Lone Star Financial in order to procure a contract with National Western. There is no evidence that National Western knew that Newman had signed the application with the annuity amount blank and that Strickland had filled it in later. There is no evidence that National Western knew that the policy receipt was a forgery, that Newman had not received her policy statements, or that it should have known she had not received them when they had evidence that she had received checks delivered to the same address.

The critical factors in discerning whether a principal has ratified an unauthorized act by his agent is the extent of the principal's knowledge of the transaction and his actions in light of that knowledge. *See Land Title Co. of Dallas*, 609 S.W.2d at 756. National Western did not have full knowledge of the material facts of the transaction required to ratify Strickland's conduct. National Western's refusal to pay Newman $200,000 is not affirmation of Strickland's fraud. In this case, Strickland's conduct was fraud on the principal as well as on Newman. Since the agent's act is fraud upon the principal, it is incapable of ratification, because no principal would confer authority to practice a fraud upon itself. *See Saenz*, 786 S.W.2d at 111; *Lincoln Fire Ins. Co. v. Taylor*, 81 S.W.2d 1059, 1060 (Tex. App.—Fort Worth 1935, writ dism'd).

26

We therefore hold that there is no evidence that National Western ratified Strickland's fraudulent acts.[3] We sustain National Western's second issue and hold that there is no basis for holding National Western vicariously liable for Strickland's fraud. Because our holdings on National Western's first two issues are dispositive, we do not need to reach the rest of National Western's issues. *See* Tex. R. App. P. 47.1.

## D.  Newman cannot recover on her alternate theories of recovery.

Newman argues in her motion for rehearing that she should be allowed to seek recovery under one of the alternate theories of recovery on which the jury returned favorable findings. *See Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988). We first note that it seems that a judgment

---

[3]To the extent that Newman argues that National Western ratified Strickland's conduct by continuing to employ him, we note that this is not sufficient evidence of ratification. *See, e.g.*, *Durand v. Moore*, 879 S.W.2d 196, 203 (Tex. App.—Houston [14th Dist.] 1994, no writ) (holding that an employer may not be liable for exemplary damages under a theory of ratification when the only evidence of ratification was "[t]he mere retention of an employee"); *see also Allen v. Ctr. Operating Co., L.P.*, No. CIV.A. 302CV1764P, 2003 WL 22364328, at *8 (N.D. Tex. Oct. 1, 2003) (relying on *Durand* in holding that employer did not ratify employee's assault by not terminating employee). Although there was evidence that National Western had received complaints about Strickland prior to his dealings with Newman, the evidence was also that those complaints had been investigated and resolved. The first complaint was for undelivered policies and resulted in a full refund by National Western. The second complaint was withdrawn "due to a misunderstanding." The third complaint involved Strickland's deceased partner's failure to return funds to the policyholder. Strickland claimed he was unaware of the failure, and when he was made aware, he returned the amount to the policyholder. Retaining Strickland after investigating these complaints is not evidence that National Western approved or ratified Strickland's acts.

27

rendered in this court is the proper remedy, not remand to the trial court. *See Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 280 (Tex. 1995) (evaluating alternative theories of liability and rendering a take nothing judgment on all theories submitted to the jury).

The jury returned findings favorable to Newman on whether *Strickland* violated the Deceptive Trade Practices Act and whether *Strickland* breached a contract with Newman. However, to hold *National Western* liable for those actions necessitates a finding that National Western is vicariously liable for Strickland's actions. *See Qantel Bus. Sys., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 305 (Tex. 1988) (noting that "traditional common law theories of vicarious liability, such as agency or respondeat superior" provide the only bases for creating vicarious liability under the DTPA); *Sw. Land Title Co. v. Gemini Fin. Co.*, 752 S.W.2d 5, 8 (Tex. App.—Dallas 1988, no writ) (holding that there was no evidence of actual or apparent authority of agent by which to hold principal liable for breach of contract). The only jury findings on that issue are in Questions One, Nine, and Eleven. Question One, as we stated above, fails to connect any authority Strickland had to the injury-producing acts that the jury found Strickland to have committed and does nothing to establish liability on the part of National Western. Question Nine asks whether Strickland was an independent contractor. We stated above that he was not as a matter of law. Question Eleven asks whether National Western ratified Strickland's conduct. As we held above, it did not. Thus, there is no jury finding by which National

28

Western can be held vicariously liable for Strickland's bad acts on any of Newman's theories of recovery. Accordingly, we render judgment that Newman take nothing against National Western on her alternate theories of recovery. *See Transp. Ins. Co.*, 898 S.W.2d at 280 (rendering a take nothing judgment on alternative theories because there was no evidence to support recovery under any of the theories); *Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 652 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (rendering a take nothing judgment under the plaintiff's alternative theory of recovery when there was no evidence to support the jury's findings on that theory).

**E. Newman's request for sanctions was properly dismissed.**

Newman filed a postjudgment motion to sanction National Western for allegedly failing to produce documents in pretrial discovery regarding customer complaints against Strickland. During discovery, Newman made the following relevant requests for production:

> Request for Production No. 20: A copy of all complaints made by anyone about you to the Texas Department of Insurance [TDI].
>
> . . . .
>
> Request for Production No. 25: Your complete file on Defendant Lynn Strickland and or Lone Star Financial.
>
> . . . .
>
> Request for Production No. 28: Produce all documents surrounding all complaints to you or the complete complaint file regarding Lynn Strickland or Lone Star Financial.

In its response to request no. 20, National Western filed multiple objections, including that "[Newman] is in an equal or superior position to obtain such information from the public records or available from [TDI] which is more convenient, less burdensome or less expensive." National Western produced documents purporting to respond to requests nos. 25 and 28. It later "informally supplemented" its response with more documents relevant to requests 25 and 28.

Newman claims that in January 2010, she learned of a complaint against Strickland that had not been disclosed by National Western. She requested files from TDI in April 2010, and those files included documents which National Western did not produce during discovery. She then filed a motion for sanctions against National Western, requesting that the court require National Western to "disclose its dishonest conduct" to TDI; strike National Western's request for findings of fact and conclusions of law; and grant a monetary sanction of $75,000.

National Western filed a response and a plea to the jurisdiction. After a hearing on the motion and the plea to the jurisdiction, the trial court dismissed Newman's motion for lack of jurisdiction. In her single issue on appeal, Newman argues that the trial court incorrectly dismissed her motion for sanctions and erred in refusing to sanction National Western.

We review a trial court's determination whether to impose sanctions under an abuse of discretion standard. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d

30

581, 583 (Tex. 2006); *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620. An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

Assuming (without deciding) that the trial court did have jurisdiction to hear Newman's motion, we cannot say it erred in failing to sanction National Western. National Western demonstrated that it directed Newman to retrieve the documents from TDI in its response to her request for production. Newman does not claim that there are other documents that National Western allegedly withheld that were not in the documents she received from TDI. If Newman had contacted TDI as National Western suggested, she would have received all the documents prior to trial and would not have suffered any prejudice. However, Newman chose not to contact TDI until after trial. We cannot say that not

31

imposing sanctions under these facts is unjust. *See* Tex. R. Civ. P. 215.2(b) (requiring the order of sanctions to be just); *see also Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003) (holding that a "just" sanction must be directed to remedying the prejudice caused). Newman also argued that National Western should have been sanctioned because Newman filed two motions for sanctions. We disagree with Newman's implicit contention that a court should grant sanctions against a party solely because a party has repeatedly moved for them. We overrule Newman's sole issue.

## Conclusion

Having sustained National Western's two dispositive issues and overruled Newman's sole issue, we reverse the trial court's judgment and render judgment that Newman take nothing.

PER CURIAM

PANEL: GABRIEL, J.; LIVINGSTON, C.J.; and McCOY, J.

DELIVERED: October 13, 2011